Robert E. RANDOLPH, Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 91–1703C.**

United States Court of Federal Claims.

Aug. 30, 1994.[1]

---

1. This order, originally issued on August 4, 1993, and not published, has been reissued on this date to coincide with the court's issuance of an opinion disposing of this matter.

Robert E. Randolph, pro se plaintiff.

Patricia L. Petty, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, and James M. Kinsella, Asst. Director, for defendant; Lt. Cmdr. Russell Shaffer, Dept. of the Navy, Alexandria, VA, of counsel.

### ORDER

ROBINSON, Judge.

Plaintiff, Robert Randolph, was placed on the Temporary Disability Retirement List (TDRL) for an asthma condition in 1984 and assigned a 30% disability rating. On September 13, 1989, the Physical Evaluation Board ("PEB" or "Board") lowered Randolph's rating from 30% to 10%. Despite Randolph's disagreement with the lower rating, he was permanently separated from the Navy with a 10% disability rating in November 1989. In December 1991, Randolph filed a complaint in this court seeking judgment against the United States for back disability retirement pay and a correction of his military record to reflect a higher disability rating.

The parties have filed cross-motions for summary judgment. After oral argument on the motions, this court stayed proceedings in this matter, giving the parties an opportunity to consider settlement. As a result of the parties' discussions, defendant filed a motion to remand this case to the Board. Plaintiff challenges the motion. For the reasons detailed below, this court hereby grants defendant's motion and remands the case to the PEB for reconsideration. The Board should specifically consider the concerns emphasized below and determine whether its determination that Randolph's condition is ratable at 10% is consistent with this Order. The cross-motions for summary judgment are moot.

### Factual Background

Randolph was placed on active duty with the United States Marine Corps on June 1, 1981. On October 10, 1983, he was treated in the emergency room of the Naval Hospital at Camp Pendleton, California. The record indicates that he was treated primarily for ear pain, and that he had trouble with asthma and had experienced "sinus problems for [the] last week." P.App. at 1–3.[2]

On December 28, 1983, Randolph experienced difficulty breathing during a physical fitness test. The Camp Pendleton hospital records state that he suffered an "acute asthmatic attack" and "was experiencing exhaustion and stress." P.App. at 4.

Randolph's condition worsened between 1983 and 1984; he was treated at various times with an aerosolized bronchodilator, oral medications, and steroids. D.App. 61–62.[3] After an examination on June 22, 1984, a Camp Pendleton doctor, Dr. Hammer, diagnosed Randolph as having Reactive Airway Disease and opined that he was "unable to perform full duty." Dr. Hammer recommended that the case be referred to the Central Physical Evaluation Board (CPEB). Id. at 63.

On July 6, 1984, Randolph contested the June 22 report, alleging that it failed to accurately state the seriousness of his condi-

---

2. "P.App." refers to the appendix attached to plaintiff's cross-motion for summary judgment.

3. "D.App." refers to the appendix attached to defendant's motion for summary judgment.

tion: Randolph chronicled his history with asthma and his reactions to the various methods of treatment. D.App. at 58–59.

On December 3, 1984, the CPEB found Randolph physically unfit to perform the duties of his office and assigned him a disability rating of 30%.[4] The CPEB ordered that he be placed on the Temporary Disability Retired List (TDRL) and accorded disability benefits while on temporary retired status.[5] After being placed on the TDRL, Randolph moved to Baton Rouge, Louisiana and attended law school.

On August 11 and 12, 1986, Col. Robert Gilham, M.D., conducted Randolph's first periodic examination pursuant to 10 U.S.C. § 1210(a).[6] Dr. Gilham observed that Randolph was leading a "full and active life as a student, husband, and father." Dr. Gilham expected Randolph to "continue to do well, but require the regular use of medicines for the indefinite future." D.App. at 55–56. Dr. Gilham noted that Randolph used an albuterol inhaler six to seven times daily and once nightly. He also noted that Randolph "exhibit[ed] severe reduction in small airway function." Id. at 56.

Following this first periodic examination, the CPEB on September 5, 1986, recommended that Randolph be permanently retired with a 10% disability rating. D.App. at 46. Randolph challenged the CPEB's action on October 21, 1986, arguing that the CPEB's finding of a 10% rating was unsubstantiated. In addition, he sought a 10% disability rating for his hypertension (high blood pressure) condition. Id. at 46.

On January 6, 1987, Randolph appeared before the Physical Evaluation Board in Great Lakes, Illinois, and requested a 30% rating for his asthma and an additional 10% rating for high blood pressure. Id. at 39. He testified about the extent and frequency of his asthmatic attacks, which occurred three to four times daily. Id. at 41. The PEB concluded, significantly, that Randolph's asthmatic condition had not yet stabilized and recommended that he be retained on the TDRL with a 30% disability rating. The PEB noted that while Randolph's medical records contained evidence of hypertension, they failed to satisfy the criteria established in DOD Directive 1332.18 for compensation for that condition.[7]

On June 2, 1988, Dr. Gilham again examined Randolph. He observed that Randolph's asthma remained relatively well-controlled; that is, Randolph's condition remained essentially the same over the two previous years, even though he required "considerably more medicine than" before. D.App. at 53–54. Dr. Gilham concluded that "with the use of intelligent medical management, [Randolph could] be expected to do well in occupations that do no[t] require strenuous physical exertion." Id.

Dr. Gilham examined Randolph once more on May 31, 1989. He reported the following:

[Randolph's] asthmatic condition has remained much the same over the last three years in that he has frequent symptoms that are responsive to the regular use of his oral inhaled medications. As long as he paces himself and avoids excessive exertion, he is able to function effectively in his present occupation as a lawyer.

Id. at 50.

After this third evaluation, the PEB concluded, on June 15, 1989, that Randolph was "unfit because of physical disability" and rec-

4. Randolph was assigned a percentage disability rating pursuant to the Veterans Administration (VA) Schedule for Rating Disabilities. D.App. at 57.

5. The TDRL is a non-working pay status geared toward rehabilitation or stabilization of medical conditions. 10 U.S.C. § 1210 (1988). From the TDRL, a service member may: (1) return to work; (2) be discharged with severance pay; or (3) if the disability is 30% or greater, be separated with a permanent disability retirement. 10 U.S.C. §§ 1201, 1210.

6. Service members who are on the TDRL must be given a physical examination at least once every 18 months. 10 U.S.C. § 1210(a). Dr. Gilham evaluated Randolph's medical condition in August 1986, June 1988, and May 1989.

7. DOD Directive 1332.18 "provides a listing of medical conditions and physical defects which normally are cause for referral to physical evaluation boards.... The major objective of the list is to achieve uniform disposition of cases arising under the law." See P.App. at 6.

ommended that he be separated from the service with a 10% disability rating under 10 U.S.C. § 1210. R.App. at 8.[8] The PEB based this finding on prior determinations of the Record Review Panel ("RRP"). *Id.* Randolph challenged the 10% rating. The PEB conducted a hearing addressing his challenge on September 13, 1989. At that proceeding, Randolph objected to the 10% rating, requesting permanent retirement with a 60% disability rating for asthma, as well as additional ratings for his sinusitis and hypertension. D.App. at 11, 14. The PEB denied his request for an increased rating for his asthma. It found that Randolph's asthma had improved, even though he continued to be symptomatic and require medication. The Board also found that, despite Randolph's history of complaints of sinusitis and hypertension, the records failed to indicate "that either of these conditions, [was], in and of itself, an unfitting condition." D.App. at 10–11.

Randolph contested this final determination in a letter to the Board dated September 28, 1989. He sought relief from the Board's decision based on: (1) fraud, misrepresentation, or other misconduct; and (2) mistake of law. He alleged that the decision was "without authority and contrary to the great weight of evidence of record." *Id.* at 4. He claimed a 60% rating for his asthma and an additional 10% each for his hypertension and sinusitis. *Id.* at 5.

In a November 1, 1989 letter, the Director of the Navy Council of Personnel Boards denied each of Randolph's requests. The Secretary of the Navy took final action on November 21, 1989, and directed that Randolph be discharged with a 10% disability rating pursuant to 10 U.S.C. § 1210.

Randolph did not file a request for relief from the Board for Correction of Naval Records. On December 19, 1991, Randolph filed a petition with this court seeking a review of the PEB's decision.

---

**8.** "R.App." refers to the appendix attached to defendant's opposition to plaintiff's cross-motion

for summary judgement.

## DISCUSSION

Randolph seeks judgment against the United States for a lump sum payment for back disability retirement pay and a correction of the disability rating in his military record from 10% to 80%. He contends that the Secretary of the Navy's decision, through the PEB, is arbitrary and capricious for essentially two reasons: (1) the decision is contrary to the applicable regulations and statutes; and (2) the decision is not based on substantial evidence because the Board unreasonably construed and ignored relevant and competent evidence. Furthermore, he alleges that the Board members failed to adequately discharge their duties.

Defendant contends, in its cross-motion for summary judgment, that the Board's decision is supported by substantial evidence and is in accord with all the relevant regulations; therefore, the decision is neither arbitrary nor capricious. Defendant also asserts that Randolph fails to present clear and convincing evidence that the Board's decision is improper.

Nevertheless, defendant has more recently moved this court to remand this case to the Board, in light of the court's concerns expressed during oral argument on the dispositive motions. Despite plaintiff's objection to the motion, the record presently before this court compels the granting of defendant's motion.

This court's substantive review of this case follows well-established principles of review in military disability benefits cases. Generally "the court is limited to determining whether the action of the military is arbitrary, capricious, unsupported by substantial evidence or contrary to applicable statutes or regulations." *Kirwin v. United States,* 23 Cl.Ct. 497, 502 (1991) (quoting *Dzialo v. United States,* 5 Cl.Ct. 554, 561 (1984)); *see also Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983); *De Cicco v. United States,* 230 Ct.Cl. 224, 228–29, 677 F.2d 66, 70 (1982). To meet this standard, a plaintiff must demonstrate that "the personnel involved ignored relevant and competent evi-

dence, that they unreasonably construed the significant body of medical documents before them, or that in [some] other manner they failed to discharge their designated duties." *O'Neil v. United States*, 6 Cl.Ct. 317, 319 (1984) (quoting *Stephens v. United States*, 174 Ct.Cl. 365, 373, 358 F.2d 951, 955 (1966)).

As mentioned above, the PEB reviewed the 10% disability rating assigned by the RRP to Randolph in its final decision of September 13, 1989. The Board upholds that rating based on, essentially, three factors: Randolph's failure to use steroids, pulmonary test results, and Randolph's weight:

> Noting that the member has not required the use of oral or parenteral steroids except for one short course a year and a half ago, and noting the pulmonary function tests have objectively shown some improvement without the use of steroids, and noting that the member is overweight and has made no significant effort to reduce his weight, the panel finds, in agreement with the RRP, that the member is permanently unfit for military service because of (1) Reactive Airway Disease, ratable under VA Code 6602 at 10%."

D.App. at 11.

First, this court is satisfied that the Board acted within its bounds to consider Randolph's weight. The record demonstrates that the issue of Randolph's weight was raised with him; that he was aware a weight loss might improve his condition; and that he, for various reasons, had not made any significant effort to lose weight. Randolph was directly questioned about his weight and acknowledged that he had been told "a couple of times" that losing weight might improve his asthma, his blood pressure and his general physical condition. *Id.* at 26. Weight is one factor over which Randolph himself has some control.

Second, the Board emphasizes that Randolph "has not required the use of oral or parenteral steroids except for one short course a year and a half ago." This statement is misleading. The Board suggests that Randolph's condition has stabilized, if not improved, because he no longer requires steroids. The record demonstrates convincingly, however, that Randolph sought to remove steroids from his regimen in order to avoid severe side effects, which included debilitating changes in his personality and his ability to function normally. The Board's decision fails to reflect its contemplation of this fact. This court can, therefore, only conclude that the Board unreasonably construed and relied upon Randolph's discontinued use of steroids—a Hobson's choice between risking further personal desolation by continuing to use steroids, or risking a loss of benefits by ending the use of steroids.

The third factor the Board cites in support of its decision is the "objective" improvement demonstrated in certain pulmonary function tests. The Board considers a February 1985 test in which Randolph had an FVC of 3.39 liters, a FEV1 of 1.93 liters, and a FEV1/FVC ratio of 53%. The Board compares these results with those from a similar test performed in May of 1989, during which Randolph was tested in two stages.[9] For the first stage, the FVC was 4.40 liters, the FEV1 was 2.53 liters, and the ratio was 63%. The results from the second stage indicate an FVC of 5.19 liters, a FEV1 of 3.56 liters, and a ratio of 69%. *Id.* at 11. Because of the increase in each of the values, between the 1985 tests and the 1989 tests, the Board concludes that Randolph experienced an improvement in his condition between 1985 and 1989. However, the Board's reliance on these particular test results is selective and, thus, of concern to the court. The Board fails to explain why it chose to focus only on these certain test results. More importantly, it fails to explain why it refrained from considering other relevant and competent results that were also available for its consideration. When a plaintiff demonstrates that relevant and competent evidence was ignored or significant medical documents were unreasonably construed, he or she will likely prevail under the arbitrary and capricious standard of review. *Kirwin*, 23 Cl.Ct. at 502.

---

9. In fact, the record contains two sets of test values for each of the examinations in 1985, 1986, 1988, and 1989.

This court is particularly concerned with the Board's concentration on the 1985 test results. Nothing in the Board's decision states that the 1985 results are more reliable or representative than those from other years. In fact, if test results from any one year are to be singled out for a comparison with the 1989 tests, those from the 1984 examination would seem particularly pertinent. Indeed, under 10 U.S.C. § 1210(b), the Secretary, through the Board, must "make a final determination of the case of each member whose name is on the temporary disability retired list upon the expiration of five years after the date when the member's name was placed on that list." Randolph was placed on the Temporary Disability Retired List in December 1984.[10] To compare the 1984 tests with the 1989 tests is to compare the results that served as the basis for Randolph's placement on the TDRL with those same results five years later, which serve as a partial basis for the Board's final determination pursuant to § 1210(b).

Unfortunately, this court cannot determine from the current record whether an assessment by the Board of the 1984 and 1989 tests is necessary or not. This court is, however, obliged to decide whether the Board discharged its designated duty. A board's failure to consider relevant and competent evidence is arbitrary and capricious. It may be that Randolph's 1984 tests are somehow irrelevant or incompetent, although that appears unlikely. Alternately, it may be that such tests do, in fact, undermine the Board's final determination. The fact that these issues exist make defendant's motion for remand compelling.

Still other examination results are in the record—results from plaintiff's 1986 and 1988 examinations. The Board fails, however, to mention these results, even though they are readily available in the record.[11] More importantly, it is uncertain whether an assessment of these results takes into account relevant and competent evidence and, if so, what such an assessment would reveal. This court simply cannot decide these issues with confidence given the record before it. On remand, the Board should refrain from limiting itself to a comparison of results from merely two examinations without specifically explaining its decision to do so.

Next, this court observes a noticeable absence of the Board's finding that Randolph's condition has stabilized. Section 1201 states that "the Secretary may retire the member, with retired pay computed under section 1401 of this title, if the Secretary also determines that (1) based upon accepted medical principles, the disability is of a permanent nature and *stable*." (Emphasis added).

After Randolph's first periodic examination, the CPEB recommended a permanent retirement at a rating of 10%. Randolph challenged this recommendation and appeared before the PEB on January 6, 1987, requesting a higher permanent rating. At that hearing, the PEB determined that Randolph's condition had "not stabilized." As a result, it recommended that Randolph be retained on the TDRL at a 30% rating. Undoubtedly, the PEB considered the question of Randolph's stabilization significant enough in 1987 to refuse the recommendation to drop his disability rating from 30% to 10%. Yet, the Board's 1989 rationale fails to even mention whether Randolph's condition had stabilized.

The Board's omission in this regard is particularly curious in light of Dr. Gilham's evaluations that seem to indicate stabilization. Dr. Gilham, who examined Randolph three times between 1986 and 1989, specifi-

---

**10.** December 3, 1984, memo from the CPEB. D.App. at 57.

**11.** Plaintiff's test results from August 12, 1986, are:

| Stage 1 | Stage 2 |
| --- | --- |
| FVC = 4.12 L (80%) | 4.72 L (92%) |
| FEV1 = 2.78 L (70%) | 3.06 L (77%) |
| Peak = 7.9 L (77%) | 8.2 L (80%) |
| FEF = 1.75 L (36%) | 1.3 L (28%) |

Results from the June 29–30, 1988, examination are:

| Stage 1 | Stage 2 |
| --- | --- |
| FVC = 3.90 L (76%) | 4.9 L (96%) |
| FEV1 = 2.57 L (65%) | 3.02 L (77%) |
| Peak = 9.7 L (95%) | 10.3 L (101%) |
| FEF = 1.33 L (29%) | 1.61 L (34%) |

cally noted in his June 29, 1988, evaluation that "over the last two years [Randolph's] clinical condition has remained basically the same, but he is now requiring more [medication than he did at the time of his 1986 visit]." D.App. at 53. Dr. Gilham noted again, in 1989, that "the pattern of the patient's asthma has been fairly constant over the last several years and it is reasonable to assume that he will require medicines to control his condition for many years to come." *Id.* at 51.

Dr. Gilham's comments clarify that Randolph's condition stabilized by 1989, however, the doctor nowhere mentions an improvement; he only notes that Randolph's condition "has been fairly constant." Dr. Gilham states:

> [A]s long as [Randolph] takes his prescribed medicines on a regular basis, he continues to do relatively well in the physically undemanding lifestyle of his chosen occupation as a lawyer. He has frequent symptoms, especially associated with physical activity, but these symptoms usually respond to an extra use of his Albuterol Metered Dose Inhaler. I would not expect him to be able to perform effectively in the physically demanding lifestyle expected of an active duty Marine Corp[s] Officer.

*Id.* The Board should specifically address whether Randolph's condition has stabilized and, if so, what disability rating the stabilized condition justifies in light of this Order.[12]

According to the VA Guidelines Regarding Medical Conditions, ratings for an asthma or bronchial condition are assigned Code 6602. A 60% rating is given to conditions that are "severe; frequent attacks of asthma (one or more attacks weekly), marked dyspnea on exertion between attacks with only temporary relief by medication; more than light manual labor precluded." A 30% rating is given when the condition is "moderate; asthmatic attacks rather frequent (separated by only 10–14 day intervals) with moderate dyspnea on exertion between attacks." A 10% rating is given when the condition is "mild; [and has] paroxysms of asthmatic type breathing (high pitched expiratory wheezing and dyspnea) occurring several times a year with no clinical findings between attacks."

During the January 1987 hearing, Randolph defined an asthma attack as "when I can't take, breathe enough air ... they're frequent, they're not the type to send me to the hospital, it's a very uncomfortable feeling of a tight chest. Q: and it's relieved by taking your inhaler? A: Yes, sir. Only temporarily."[13] This court asked the parties to address the meaning of "attack" during oral argument on the dispositive motions. Unfortunately, a clear definition was not provided. Assuming for the moment that an asthma attack is defined as shortness of breath and a tightening of the chest, the Board's own decision evidences Randolph's frequent attacks:

---

12. Defendant focuses on Randolph's increased ability to adapt to his asthma as an indication of the improvement in his condition:

> Despite these limitations, the evidence showed that Mr. Randolph adjusted his lifestyle to fit his limitations.... The completion of law school and passing the state bar exam are celebrated achievements amongst even the most talented and capable persons. While a second year law student, Mr. Randolph argued that he was 30 percent disabled to the RPEB.... Considering Mr. Randolph's assertion, his accomplishments appear remarkable.... These facts simply evidence Mr. Randolph's ordinary adjustments to his asthma condition, not that he is entitled to more than 10 percent disability rating.

Defendant's motion for summary judgment at 6, 7, and 10.

> It seems somewhat incongruous that Randolph's disability rating should drop merely be-

cause he has adapted to his condition. If disability ratings are decreased merely because a member adapts to a disability, a disincentive to adaption is created. Members would quickly discover that their disability pay is maximized only if they do little or nothing to adapt to their disability; it is in their economic interest to do nothing. Pursuant to the Board's scheme, if a service member loses an arm in the line of duty, he or she is assigned a particular disability rating. If the member is fitted with an artificial limb and learns to use that prosthetic device, he or she is adapting to the disability. Consequently, the Board will decrease the member's disability rating. The fact remains, however, that the member has lost an arm in the performance of his or her duty to this Country.

13. Record of Proceedings, Physical Evaluation Board, January 7, 1987, p. 7; D.App. at 41.

He continues to be symptomatic and requires medication. He goes to bed about 11:00 o'clock at night, and four or five times a week will wake up about [two] o'clock short of breath. This is relieved by one squirt of his inhaler, and he's able to sleep the rest of the night.

D.App. at 10. Indeed, the Board's findings can be construed as supporting a rating of 60%, in light of the guidelines. The number of Randolph's attacks, four to five times a week, far exceeds the "several times a year" requirement to meet the 10% category. Facially, the rating assigned by the Board originally and in its 1989 disposition appear inconsistent with the guidelines above. The Board fails to mention or explain its final decision with reference to such guidelines. While this court acknowledges that the provisions are only what they say they are—guidelines—this court is troubled by the Board's apparent willy-nilly decision to either follow or not follow the guidelines. *See* 10 U.S.C. §§ 1210(c) and (d).

Finally, Randolph seeks an additional 10% rating for his sinusitis condition and his hypertension. The Board denied these requests:

Though the member complains now of sinusitis and of hypertension, there is no documentation either at the time of being placed on the TDRL, or in the course of his being on the TDRL, that either of these conditions is, in and of itself, an unfitting condition.

D.App. at 11.

The Board fails to cite the source of the unfitting "in and of itself" standard in its rationale. Defendant refers the court to SECNAVINST 1850.4A § 0212 in its opposition to plaintiff's cross-motion for summary judgment. The court, however, does not read this regulation as establishing the standard used by the Board. Section 212(c) states:

Once it has been determined that a member is unfit for duty and that the unfitting physical; impairment is ratable, *all other physical impairments meeting the rating criteria of the Veterans Administration Schedule for Rating Disabilities must be given an appropriate rating in accordance*

*with DOD Directive 1332.18.* ... Those physical impairments that are determined to be unfitting in themselves *or to contribute to the member's unfitness* will be identified on the reports of board findings to distinguish them from those impairments which, although rates, are not unfitting or do not contribute to the unfitness of the member. (Emphasis added.)

This language is not limited to a determination of whether a condition is unfitting in itself; it also contemplates a determination of whether the condition *contributes* to the member's unfitness. The Board's rationale contains no such evaluation of Randolph's two additional ailments.

When this court inquired further into additional ratings for sinusitis and hypertension, counsel for defendant directed the court's attention to SECNAVINST 1850.4A § 0212(h). *See* D.App. at 64. This section describes the stacking or "pyramiding" of disability ratings for multiple conditions in order to derive an overall disability rating:

Pyramiding is the term used to describe the application of more than one rating to any area or system of the body when the total functional impairment of that area or system is adequately reflected under a single appropriate code.... Related diagnoses should be merged for rating purposes when the VASRD provides a single code covering all their manifestations. This prevents pyramiding and reduces the chances of overrating.

The Board fails to discuss in its final decision whether Randolph's sinusitis and hypertension are diagnoses related to his asthma; that is, whether they relate to the same "area or system of the body" as asthma. Defendant merely suggests that Randolph's hypertension is related to his medication. The Board should reconsider its decision with respect to Randolph's sinusitis and hypertension consistent with this Order.

### CONCLUSION

The facts of this case present a difficult question: whether the Board's decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable

statutes or regulations. This court cannot say that the Board's decision clears these legal hurdles. It is not this court's role, however, to reweigh the evidence or redetermine Randolph's disability rating. Rather this court's task is to determine "whether the conclusion being reviewed is supported by substantial evidence," *Heisig,* 719 F.2d at 1157. The "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and ... courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Id.* at 1156.

Accordingly, defendant's motion for remand to the Board is granted. Upon such remand, the Board should specifically address the following:

1. Why it chose to compare the values from the 1985 examination only, rather than those from any other year, with the 1989 examination results.

2. Its failure to consider test results from 1984, 1986, and 1988.

3. Whether Randolph's condition has stabilized.

4. Its failure to consider Dr. Gilham's 1986, 1988, and 1989 evaluations of Randolph's condition.

5. Its failure to relate its findings and conclusions to the ratings contained in the VA Guidelines Regarding Medical Conditions.

The Board should also reconsider, to the extent reconsideration is consistent with this Order, its findings and conclusions with respect to Randolph's sinusitis and hypertension.

The parties' cross-motions for summary judgment are moot.

Since the court is not informed as to an appropriate schedule for the Board's reconsideration, the parties shall cooperate in the filing of a joint status report with this court within 30 days from the date of this Order, advising the court of the Board's time frame for reconsidering this matter. Thereafter, the parties shall file a joint status report every 60 days informing the court on the Board's progress regarding this Order.