**Gloria SANTIAGO, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 05–800C.**

United States Court of Federal Claims.

May 3, 2006.

---

Gloria Santiago, pro se, Staten Island, NY.

Claudia Burke, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Bryant G. Snee, Assistant Director, Commercial Litigation Branch. Of counsel were Lieutenant Colonel Joseph C. Fetterman and Major Christopher P. Soucie, United States Army Litigation Division, Department of the Army, Arlington, VA.

## OPINION AND ORDER

LETTOW, Judge.

In this military disability case, plaintiff Gloria A. Santiago, a medically retired Sergeant in the United States Army Reserve, contests her disability rating as determined by the Army's disability evaluation process. Ms. Santiago served both on active duty and in the active reserve from 1978 to 2004.[1] She incurred physical disabilities while serving in the military, rendering her unfit for duty, and she was placed on the Army's Temporary Disability Retired List ("TDRL") on November 4, 2004. Ms. Santiago avers that she is entitled to receive a higher disability rating than that awarded to her, leading to additional disability benefits. Among other things, Ms. Santiago alleges that the process by which her rating was assigned was improper and did not conform to applicable Army regulations.

Ms. Santiago originally brought her claims before the U.S. District Court for the Eastern District of New York ("District Court"). In that court, the Army moved to dismiss her complaint for lack of subject matter jurisdic-

---

1. Ms. Santiago most recently was a soldier in the United States Army Reserve assigned to full-time active service under the Active Guard and Reserve ("AGR") Program. See 10 U.S.C. §§ 672, 12301(d), 12310. See also Anderson v. United States, 59 Fed.Cl. 451, 453 & n. 5 (2004).

tion, and, pursuant to a thoughtful opinion and order issued by Judge Gleeson of that court, the case was transferred to this court. *See Santiago v. United States Army*, No. 04–CV–4882 (JG), 2005 WL 1250281 (E.D.N.Y. May 26, 2005).

Here, the government has filed a motion for partial dismissal and a motion for judgment upon the administrative record, and Ms. Santiago has filed a cross-motion for judgment upon the administrative record. A hearing was held on March 15, 2006. For the reasons set forth, the government's motions for partial dismissal and for judgment upon the administrative record are denied. Ms. Santiago's cross-motion for judgment upon the administrative record is granted in part. The court remands the matter to the Secretary of the Army for redetermination of Ms. Santiago's disability rating in accord with the directions set out below.

## BACKGROUND

Ms. Santiago initially began her military service on October 2, 1978. AR 200 (Orders C09–491367 (Sept. 10, 2004)).[2] From her date of enlistment until approximately 2001, Ms. Santiago had performed satisfactorily and had been evaluated favorably in her various assignments. *See* AR 1–37 (Various Army Evaluation Reports (1983–2001)), 91 (Mem. from Colonel Peter C. Wei to Physical Evaluation Board (May 2, 2003)). In 2001, Ms. Santiago was a Sergeant assigned to the 300th Executive Medical Company in Shoreham, New York. AR 36 (NCO Evaluation Report (Mar. 21, 2001)).

Ms. Santiago began experiencing a deterioration in her physical condition that required "continued medical care and affected her ability to perform any military duties." AR 91; *see* Plaintiff's Response to Defendant's Motion and Cross Motion for Judgment ("Pl.'s Cross–Mot.") Appendix ("App.") Ex. 19 (Letter from Dr. Andrew J. Adler, Department of Veterans Affairs (July 22, 2002)) (stating that Ms. Santiago has been his pa-

tient since May 2001 and has been treated for a variety of "debilitating conditions" that "make it impossible for her to work"). She was placed on convalescent leave due to her medical condition. *See, e.g., id.* (Mems. from Dr. Barbara Colon for Commander, 300th Medical Company (Jan. 29, 2001; Mar. 30, 2001)) (recommending convalescent leave from January 29, 2001 through February 11, 2001 and March 30, 2001 through April 12, 2001). Thereafter, Colonel Frank J. DeGaetano, commanding officer of the 8th Medical Brigade, of which Ms. Santiago's 300th Medical Company was a part, requested a medical evaluation for Ms. Santiago "to determine her retainability in" an active status in the Army. *Id.* (Mem. from Col. DeGaetano for Colonel Jayaram, Fort Totten, New York (Apr. 7, 2001)) (stating that he believed Ms. Santiago's medical condition precluded her from performing her "duties to standard or regulation" and military occupational speciality); *id.* (Mem. from Col. DeGaetano for Kathy Hutton, West Point Medical Board Department (Dec. 19, 2001)) (stating that Ms. Santiago "requires an immediate fit for duty physical to determine her retainability and deployability in the U.S. Army"). Subsequent to Colonel DeGaetano's requests, Ms. Santiago was examined on various occasions by medical doctors and specialists, including Dr. Adler of the Department of Veterans Affairs and Dr. Colon of Ainsworth U.S. Army Health Clinic at Fort Hamilton. On numerous occasions, she was placed on convalescent leave and was ordered hospitalized for short periods. AR 91 (Mem. from Colonel Wei for Physical Evaluation Board (May 2, 2003)). Ultimately, Ms. Santiago was placed under the administrative control of Keller Army Community Hospital for physical disability processing pursuant to Army Regulation 635–40, and a medical evaluation board ("MEBD") was convened. AR 138 (Mem. from Kathy Hutton, Physical Evaluation Board Liaison Officer ("PEBLO") to Commander, 300th Medical Company (May 7, 2002)).[3]

---

**2.** "AR" refers to the Administrative Record filed with the court by the government. "Hr'g Tr." refers to the transcript of the hearing conducted in this matter on March 15, 2006.

**3.** An MEBD is "convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Solider's status.... If the MEBD determines the Soldier does not meet retention standards, the board will recommend

Following a temporary hiatus, on May 2, 2003, the Army's disability evaluation process with respect to Ms. Santiago was reinstituted.[4] *See* AR 91; *see also* AR 90 (Mem. from Hutton for Commander, 300th Medical Company (May 2, 2003)) (stating that Ms. Santiago was pending before an MEBD). Also, on that date, Ms. Santiago's request for voluntary retirement was approved and she was scheduled for release on June 30, 2003. AR 116 (Personnel Action (May 2, 2003)). In accord with Army regulations, Ms. Santiago was retained on active duty beyond her scheduled release date for continued medical care and to complete the medical disability evaluation process. AR 115 (Mem. from Colonel Gina S. Farrisee for Commander, Walter Reed Army Medical Center (May 8, 2003)) (approving request for retention of Ms. Santiago on active duty until August 28, 2003); *see* Army Regulation 635–200, §§ 1–24, 1–33, and Army Regulation 635–40, § 3–7.d. Ms. Santiago's scheduled release date was extended five additional times until she was ultimately placed on the TDRL on November 4, 2004. *See* AR 109 (Orders C–06–390858A01 (Aug. 12, 2003)) (extending scheduled release date to November 30, 2003); AR 107 (Orders C–06–390857A02 (Dec. 2, 2003)) (extending scheduled release date to February 29, 2004); AR 103 (Orders (Feb. 18, 2004)) (extending scheduled release date to May 31, 2004); AR 102 (Mem. from Colonel Farrisee for Commander, Walter Reed (June 1, 2004)) (extending scheduled release date to August 31, 2004); Pl.'s Cross–Mot. App. Ex. 19 (Mem. from Colonel E. Eric Porter for Commander, Walter Reed (Sept. 3, 2004)) (extending scheduled release date to November 30, 2004); AR 200 (Orders C–09–491367 (Sept. 10, 2004)) (placing Ms. Santiago on TDRL on November 4, 2004).

On October 27, 2003, the MEBD issued its findings with respect to Ms. Santiago's medical condition, which findings were accepted by the approving authority on November 4, 2003. *See* Pl.'s Cross–Mot.App. Ex. 5 (MEBD Proceedings); *see also* AR 274–75 (Narrative evaluation provided by Dr. Victor McGlaughlin (2003)). The MEBD found that Ms. Santiago suffered from eleven medical conditions, of which four, diabetes mellitus, hypertension, chronic lower back pain, and migraine headaches, had been "permanently aggravated by service" and independently caused Ms. Santiago to fail to meet retention standards. Pl.'s Cross–Mot. App. Ex. 5; *see* Army Regulation 40–501.[5] Consequently, the MEBD referred Ms. Santiago to a Physical Evaluation Board ("PEB"). Pl.'s Cross–Mot. App. Ex. 5; *see* Army Regulation 635–40, §§ 4–10, 4–13 (stating that a soldier should not be referred to a PEB "unless the Soldier has medical impairments that raise substantial doubt as to ... her ability to continue to perform the duties of. her office, grade, rank, or rating.").[6] Army regulations require that a narrative summary of the patient's medical condition be prepared by an examining physician and be included in the MEBD findings. Army Regulation 40–400, §§ 7–8, 7–24; *see* AR 90 (Mem. from Hutton to Commander, 300th Medical Company (May 2, 2003)). In this instance, two narrative summaries of Ms. Santiago's medical condition were prepared, one prior to the suspension of the disability evaluation pro-

---

referral of the Soldier to a [Physical Evaluation Board]," which will determine if a particular soldier should be separated or retired from the Army because of a disability. Army Regulation 635–40, § 4–10.

**4.** The Army's disability evaluation system was temporarily suspended because Ms. Santiago was improperly shifted from convalescent leave to Absent Without Leave. *See* Army Regulation 635–40, § 4–5. Once this error was corrected, the process medically to evaluate Ms. Santiago was restarted and the MEBD was reconvened.

**5.** The MEBD found that the other seven conditions were not aggravated by military service: major depressive disorder, osteoarthritis, chronic bilateral leg pain, bilateral carpel tunnel syndrome, gastroesophageal reflux disease, tobacco use, and COPD. Pl.'s Cross–Mot. App. Ex. 5; AR 235.

**6.** A PEB is "established to evaluate all cases of physical disability equitably for the Soldier and the Army." Army Regulation 635–40, § 4–17.a. A PEB is a fact-finding board whose responsibilities include investigating the soldier's disability, evaluating the soldier's condition in comparison to the particular physical requirements of the soldier's office, grade, rank or rating, providing a full and fair hearing, and making findings and recommendations with respect to whether a soldier should be separated or retired because of disability. *Id.*

cess, and a second after the MEBD was restarted. AR 274–75; Plaintiff's Administrative/Military Medical Records ("Pl's Med. Records") Vol. II at 93–94 (Narrative evaluation provided by Dr. Mark Simmons (May 17, 2002)).[7] Ms. Santiago received the MEBD findings on November 13, 2003. AR 237 (PEBLO Counseling Checklist (Nov. 13, 2003)).

The PEB requested additional information from the MEBD with respect to its findings regarding lower back pain, AR 238–39 (Narrative evaluation provided by Dr. Dean C. Taylor (Feb. 7, 2004)), and to the finding of migraine headaches. AR 240 (Narrative evaluation provided by Dr. Victor McGlaughlin (Feb. 17, 2004)). Thereafter, an informal PEB[8] issued its findings and recommendations for Ms. Santiago and concluded that she should receive a disability rating of 20% for

diabetes, 20% for chronic back pain, and 10% for migraine headaches. Pl.'s Cross–Mot. App. Ex. 17 (Informal PEB Proceedings (March 16, 2004)); AR 176–78 (same). Based on the Army's formula for calculating a disability percentage, Ms. Santiago was assigned a disability rating of 40%. Id.[9] The informal PEB concluded that Ms. Santiago's "condition ha[d] not stabilized to the point that a permanent degree of severity c[ould] be determined" and therefore placed her on the TDRL. Id.; see 10 U.S.C. § 1210.[10] The informal PEB also found that Ms. Santiago's remaining eight medical conditions, including her hypertension, were "medically acceptable." Id. Ms. Santiago did not concur with the informal PEB's decision, and, as the regulations allowed, she submitted a rebuttal statement and requested a formal PEB hearing pursuant to Army Regulation 635–40,

7. With her last brief, Ms. Santiago provided two volumes of documents that she represents to be her military medical records from 1979–2004 and which "were submitted to the PEB." Plaintiff's Reply to Defendant's Response to Plaintiff's Motion and Cross Motion for Judgment ("Pl.'s Reply") at 7. Some, but not all, of the documents contained in these volumes are identical to items included in the administrative record certified by the Department of the Army. The government represented to the court that, due to privacy concerns, the Army no longer retains certain medical records after a soldier is discharged. Hr'g Tr. at 12:3–21. After Ms. Santiago was discharged from the Army in November 2004, the government contends that it did not have access to certain records and that the Army compiled the administrative record based on those records that were available to it. Hr'g Tr. at 13:13–20. In all events, the government does not question the authenticity of any of the records contained in the two volumes attached to Ms. Santiago's reply. Hr'g Tr. at 11:23 to 12:3. Furthermore, the government concedes that these records should be, and now also are, part of the record in this case. Hr'g Tr. at 14:7–11.

8. An informal PEB evaluates a soldier's disability claim after a referral from an MEBD. Army Regulation 635–40, § 4–20.a. The purpose of the informal PEB is to "reduce the overall time required to process a case through the disability evaluation system." Id. Ultimately, the same criteria and guidelines are used in both informal and formal PEBs. Id. Should a soldier not concur with an informal PEB's conclusions, they may submit a rebuttal and request a formal PEB hearing. Army Regulation 635–40, §§ 4–20.e(6), 4–21.a.

9. The Army's disability ratings are calculated on a cumulative basis that correlates the percentage

for each disability condition to the soldier's overall circumstances. The Army begins with the highest percentage of any assigned disability and subtracts that figure from 100%. In this case, the highest percentage was 20%, and therefore Ms. Santiago had 80% remaining. Subsequently, the Army took the next highest percentage, in this case another 20%, from the remaining 80%, which equaled 16%. Finally, the Army removed 10%, the final rating, of the now-remaining 64%, which equaled 6.4%. The three resulting percentages, 20%, 16%, and 6.4%, when added produced 42.4%. As rounded, the final disability rating became 40%. See Hr'g Tr. at 23:18 to 24:17.

10. A soldier is "placed on the TDRL when it is determined that the Soldier is qualified for disability retirement under 10 U.S.C. [§ ] 1201 but for the fact that his or her disability is determined not to be of a permanent nature and stable." Army Regulation 635–40, § 7–2.a; see Separation or Retirement for Physical Disability, DOD Directive No. 1332.18 §§ 3.10–3.11 (Nov. 4, 1996). Soldiers on the TDRL must undergo a "medical examination and PEB evaluation at least once every 18 months to decide whether a change has occurred in the disability for which the Soldier was temporarily retired." Army Regulation 635–40, § 7–4. Based on the recommendation of the PEB or after the soldier's fifth anniversary of her placement on the TDRL, so long as the soldier has been periodically evaluated, the Army's Human Resources Command will either permanently retire the soldier with disabled retired pay, separate the soldier with severance pay, separate the soldier without any benefits, or determine the soldier fit for duty. Army Regulation 635–40, § 7–11.

§§ 4–20.e(6) and 4–21.a(1). Pl.'s Cross–Mot. App. Ex. 17; AR 176–180.

On May 19, 2004, a formal PEB hearing was conducted. AR 181–83 (Formal PEB Proceedings (May 19, 2004)). The formal PEB considered Ms. Santiago's medical records, the findings of the MEBD, and a folder provided by Ms. Santiago containing approximately two dozen documents including memoranda written by her physicians. Pl.'s Cross–Mot. App. Ex. 18 (Audio recording of the formal PEB proceeding). Ms. Santiago objected to the exclusion of hypertension from the listing of disabling conditions. *Id.* Ultimately, the formal PEB affirmed the findings of the informal PEB, awarded Ms. Santiago a disability rating of 40%, and placed her on the TDRL. AR 181–83. The formal PEB agreed with the informal PEB that Ms. Santiago suffered from hypertension but that it alone did not render her unfit for duty. *See id.;* Pl.'s Cross–Mot. App. Ex. 18 (stating that "we never find hypertension unfitting; in most cases it's controlled, even if it's not perfectly controlled, it usually, it itself would not prevent satisfactory performance of duties.").[11] Afterwards, Ms. Santiago received a copy of the formal PEB's proceedings, AR 226–27 (Letter from Colonel James Babbitt to Santiago (May 19, 2004)), and acknowledged her understanding that she had ten days to file a written rebuttal. AR 228 (Formal Election Statement of Understanding (May 19, 2004)).

Ms. Santiago filed a rebuttal, dated May 27, 2004, to the findings of the formal PEB. AR 186–90; *see* Army Regulation 635–40, § 4–21.s–t. The President of the PEB responded and notified Ms. Santiago that the members of the PEB had affirmed their decision. AR 191–93; *see* Army Regulation 635–40, § 4–21.t(2).[12]

Subsequently, the PEB forwarded the matter to the U.S. Army Physical Disability Agency ("USAPDA") because Ms. Santiago did not concur with the formal PEB's findings. AR 207 (Letter from Lt. Col. Richard L. Rankin, USAPDA, to Santiago (July 20, 2004)); *see* Army Regulation 635–40, § 4–22.a(3). USAPDA ultimately affirmed the formal PEB findings, AR 207, and forwarded the case to the U.S. Army Human Resources Command for final disposition.[13]

Effective November 3, 2004, after having served over 20 years in the Army, AR 199 (Chronological Statement of Retirement Points (May 1, 2003)), Ms. Santiago was "released from assignment and duty because of physical disability" and placed on the TDRL with a disability rating of 40%. AR 200 (Orders C–09–491367 (Sept. 10, 2004)).

Promptly thereafter, on November 10, 2004, Ms. Santiago filed suit against the Army in the District Court. *Santiago v. United States Army,* 2005 WL 1250281, at *2 (E.D.N.Y. May 26, 2005). The Army moved to dismiss the action for lack of subject mat-

11. During the formal PEB hearing, the Acting President of the PEB noted that the informal PEB's description of hypertension in its findings as "medically acceptable" was incorrect; rather, that particular disability should have been described as "not unfitting." Pl.'s Cross–Mot. App. Ex. 18.

12. The President of the PEB accepted a minor point raised in Ms. Santiago's rebuttal that a technical error existed in the report of the formal PEB's findings. Ms. Santiago had expressed concern that the person who had been originally assigned to her as military counsel for the PEB proceedings, whom she had subsequently rejected in favor of her husband's representation, had signed the formal PEB's report. AR 188. The President of the PEB acknowledged that this was in error, AR 192, attached a memorandum from the military counsel noting the mistake, AR 194, and informed Ms. Santiago that a corrected report of the formal PEB findings would be pre-

pared. *See* AR 204–06 (Corrected Formal PEB proceedings).

13. As specified in Army Regulation 635–40, two additional disability review boards exist, but neither applies to Ms. Santiago's circumstances. The first, the Army Physical Disability Appeal Board, will review a soldier's disability rating only if the matter is forwarded by the Commanding General of USAPDA. Army Regulation 635–40, § 4–25. No such referral was made in this instance. The second, the Army Disability Rating Review Board, "reviews disability percentage ratings on request of a Soldier who was retired because of physical disability." Army Regulation 635–40, § 4–26. Ms. Santiago was not retired at the time the actions being challenged were taken, and thus the Army Disability Rating Review Board was not pertinent to her case. Now that Ms. Santiago is retired, however, the Rating Review Board could act on a new request by Ms. Santiago. *See* Hr'g Tr. 42:23 to 43:25.

ter jurisdiction. *Id.* Although the District Court concluded that it did not have subject matter jurisdiction to entertain Ms. Santiago's claims, it held that this court would have jurisdiction under 28 U.S.C. § 1491. *Id.* at *4. Therefore, it directed that the case be transferred to this court pursuant to 28 U.S.C. § 1631. *Id.* After transfer, Ms. Santiago filed her complaint in this court on August 22, 2005.

## STANDARDS FOR DECISION

As a threshold matter, the jurisdiction of the court must be established before it may proceed to the merits of any action. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Ms. Santiago, as the plaintiff, bears the burden of proving that this court has subject matter jurisdiction over her complaint. *McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). The court must construe the assertions in the complaint in the light most favorable to Ms. Santiago, as the plaintiff, in ruling on a motion to dismiss for lack of jurisdiction. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Metz v. United States,* 61 Fed.Cl. 154, 164 (2004); *see also Hamlet v. United States,* 873 F.2d 1414, 1415–16 (Fed.Cir. 1989). The court must deny the motion to dismiss if the undisputed facts reveal any basis on which the plaintiff might prevail. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683 (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In military cases, this court's role is limited. *Metz,* 61 Fed.Cl. at 165. "It has long been established that it is 'beyond the institutional competence of courts to review' the substance of decisions that have been left exclusively to the discretion of the military." *Roth v. United States,* 56 Fed.Cl. 239, 244 (quoting *Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002)); *see Groves v. United States,* 47 F.3d 1140, 1144 (Fed.Cir. 1995). "It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial prov-

ince; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983). When this court is asked to review the disposition of a military disability evaluation board, the standard of review is whether the decision was "arbitrary, capricious, not supported by substantial evidence, or contrary to applicable statutes and regulations." *Bernard v. United States,* 59 Fed.Cl. 497, 501 (2004), *aff'd,* 98 Fed.Appx. 860, 862 (Fed.Cir.2004); *see Heisig,* 719 F.2d at 1156; *Poole v. United States,* 64 Fed.Cl. 776, 781 (2005); *see also Fisher v. United States,* 402 F.3d 1167, 1180–81 (Fed.Cir.2005).

## ANALYSIS

### A. Subject Matter Jurisdiction

As an adjunct to her disability claims, Ms. Santiago in her complaint averred that the jurisdiction of this court was invoked pursuant to several statutory provisions protecting civil rights and correlative articles of the Uniform Code of Military Justice. Compl. at 1. In her response and cross-motion, however, Ms. Santiago clarified that the jurisdictional basis of her claims was the Tucker Act, 28 U.S.C. § 1491, and in that context, she referred to the District Court's decision that this court possessed subject matter jurisdiction. Pl.'s Cross Mot. at 1; *see Santiago,* 2005 WL 1250281, at *4. The government asserts that "to the extent that Ms. Santiago continues to pursue her claims of discrimination" the court should dismiss those claims for lack of subject matter jurisdiction. Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss and Alternatively Motion for Judgment Upon the Administrative Record ("Def.'s Reply") at 2; *see* Hr'g Tr. at 5:10 to 6:7.

Ms. Santiago appears before this court, as she did in the District Court, on a *pro se* basis. In a *pro se* complaint, the allegations are tested against less stringent pleading standards than those that would apply normally. *See Goel v. United States,* 62 Fed.Cl. 804, 806 (2004) (citing *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652

(1972)); *Ware v. United States,* 57 Fed.Cl. 782, 784 (2003). In *pro se* actions, "the court searches the record 'to see if plaintiff has a cause of action somewhere displayed.'" *Boyle v. United States,* 44 Fed.Cl. 60, 62 (1999) (quoting *Ruderer v. United States,* 188 Ct.Cl. 456, 468, 412 F.2d 1285 (1969)). The fact, however, that a plaintiff has proceeded *"pro se* in the drafting of [her] complaint may explain its ambiguities, but it does not excuse its failures, if such there be." *Henke v. United States,* 60 F.3d 795, 799 (Fed.Cir. 1995).

The Tucker Act governs whether this court has subject matter jurisdiction over the present action. 28 U.S.C. § 1491. The statute provides that this court "shall have jurisdiction to render judgment upon any claim against the United States founded ... upon the Constitution, or any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a)(1). The Tucker Act alone is insufficient to confer jurisdiction upon this court. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). A plaintiff must also "identify some independent basis ... upon which [she] is entitled to monetary payment from the federal government." *Metz,* 61 Fed.Cl. at 166 (citing *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983); *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998)).

This court has subject matter jurisdiction over Ms. Santiago's claims. The fact that Ms. Santiago includes citations to civil rights statutes and the Uniform Code of Military Justice in her complaint, *see* Compl. at 1, does not transform the jurisdictional ground established by the Tucker Act for consideration of Ms. Santiago's claims. In her complaint and cross-motions, Ms. Santiago asserts and supports two general claims: (1) that the procedures employed in the Army's

disability evaluation process were improper and violated Army regulations, Pl.'s Cross–Mot. at 1 ("Plaintiff will prove that the [PEB] was not properly adjudicated"), and (2) that the PEB erred when it awarded her a disability rating of 40% and found that her hypertension was "not unfitting." *Id.* at 1. Ms. Santiago's claims of entitlement fall squarely within 10 U.S.C. § 1201, which constitutes a money-mandating statute. *See Chambers v. United States,* 417 F.3d 1218, 1223 (Fed.Cir.2005) (citing *Fisher,* 402 F.3d at 1174–75). In that connection, she may challenge both the procedures that were employed in the disability evaluation process and her final disability rating. *Chambers,* 417 F.3d at 1224–28. The government's motion to dismiss accordingly is denied.

**B. The Army's Disability Rating**

 On the merits, Ms. Santiago contends that the PEB erred in its evaluation of her hypertension after the MEBD had determined that she failed to meet retention standards because of that condition, among others. Pl.'s Cross–Mot. at 4. She also suggests that the PEB did not consider all of her medical records when it assigned her a 40% disability rating. *Id.* at 5. The government contends that the PEB's determination that Ms. Santiago should be assigned a 40% disability rating was supported by substantial evidence and was neither arbitrary nor capricious. Def.'s Mot. at 10–14. It argues that the PEB's findings that Ms. Santiago's hypertension was "not 'independently unfitting'" and that the condition did not interfere with her military performance were based upon substantial evidence in the administrative record. *Id.* at 12.[14]

The medical premises for the PEB's action were generated by the MEBD. An MEBD is "convened to document a soldier's medical status and duty limitations insofar as duty is

---

**14.** The government relies upon Army Regulation 635–40, App. B, which incorporates portions of the Department of Veterans Affairs' Schedule for Rating Disabilities ("VASRD"), as a guide, and particularly the schedule of ratings for the cardiovascular system. Def.'s Mot. at 12–13. *See* Army Regulation 635–40, § 4–19. *i* and App. B, ¶¶ B–65 to B–69 ("Cardiovascular disease"). The government contends that "to be unfitting, even at the minimum level of 10 percent, the

disatolic blood pressure (the bottom number in the blood pressure reading) must be *predominantly* 100 or more or the systolic blood pressure (the [top] number) must be *predominantly* 160 or more." Def.'s Mot. at 12–13 (emphasis in original). Although Ms. Santiago's blood pressure readings at times exceeded these thresholds, the government contends that "they did not do so predominately or even with any regularity." *Id.* at 13.

affected by the member's medical status." *See* Army Regulation 40–400, § 7–1. The MEBD's ultimate decision with respect to a soldier's "medical qualification for retention," is based on the guidelines and criteria delineated in Army Regulation 40–501. *See* Army Regulation 635–40, § 4–10. The scope of an MEBD, however, is limited, and "[d]ecisions regarding unfitness for further military duty because of physical or mental disability are prerogatives of PEBs.... MEB[D]s will not express conclusions or recommendations regarding such matters." Army Regulation 40–400, § 7–1. In short, an MEBD will evaluate a soldier only in terms of her satisfaction of retention standards; subsequently, a PEB will use those findings to assess whether the soldier is fit for duty. *See* Army Regulation 635–40, § 3–1.a ("These retention standards and guidelines should not be interpreted to mean that possessing one or more of the listed conditions or physical defects signifies automatic disability retirement or separation from the Army."); *see generally Slesinski v. United States,* 34 Fed.Cl. 159, 162–63 (1995) (describing the Army's disability evaluation process).

Several of Ms. Santiago's contentions bear on what the MEBD and the PEB actually decided. She first avers that the PEB improperly removed hypertension from the MEBD findings. Compl. at 4. The PEB, however, did not remove hypertension from the listing of medical conditions found by the MEBD to be pertinent to Ms. Santiago. In both the original and corrected informal PEB findings, as well as the formal PEB findings, hypertension is not listed by name but it is denoted by code "MEB DX 2." *See, e.g.,* AR 176. This code refers to the MEBD's report of findings which listed hypertension as the second of eleven separate medical conditions suffered by Ms. Santiago. *See* AR 235.

Ms. Santiago also contends that because the MEBD and her doctors diagnosed her with hypertension, the PEB cannot thereafter find that she is still fit for duty insofar as that condition is concerned. Pl.'s Cross-Mot. at 4. Again, however, the MEBD only evaluates whether an individual fails to meet retention standards with respect to their medical condition. By contrast, the "most important determination" for the PEB "is whether the Soldier is physically fit or unit to perform the duties of the Soldier's office, grade, rank, or rating." Army Regulation 635–40, § 4–19.d(1). Consequently, a soldier might fail a retention standard as evaluated by the MEBD and yet be determined fit for duty by the PEB. The Department of the Army fully contemplates that variances will arise between the MEBD findings and PEB conclusions and in that respect directs PEB Presidents to explain fully any such differences that arise. *See* Army Regulation 635–40, § 4–19. *l* (*l* ) ("A significant variance may occur between the disability described in block 8 of DA Form 199 [the record of proceedings of the formal PEB hearing] and diagnoses or degree of impairment reflected in the MEBD proceedings. If so, explain the variance completely in block 16."); *see also* Policy Guidance Memorandum # 9: Minimal Requirements for the Rationale on DA Form 199, United States Army Physical Disability Agency, Department of the Army (Feb. 28, 2005).

Ms. Santiago further alleges that Lieutenant Colonel James Martin, who was acting PEB President during Ms. Santiago's formal PEB hearing on May 19, 2004, expressly conceded that "the removal of Hypertension [from the informal PEB report] was a mistake, it is one of the four illnesses, [and] that it should have been found 'Unfit for Duty.'" Pl.'s Reply at 4. This allegation overstates what happened at the hearing. Based on the audio recording of the formal PEB hearing, Pl.'s Cross–Mot. App. Ex. 18, the court concludes that Lt. Col. Martin merely noted an error in the informal PEB report, *i.e.,* that hypertension was incorrectly evaluated as "medically acceptable," *see* Pl.'s Cross–Mot. App. Ex. 17, AR 176–77, rather than "not unfitting." *See supra,* at 225 n. 11. At no time during the formal PEB hearing did the Acting President of the PEB state that hypertension should be described as "unfit for duty."

In the main, however, Ms. Santiago focuses on arguments that the PEB's disability rating decision was arbitrary, capricious, unsupported by substantial evidence or contrary to law. In this respect, the court ac-

knowledges that its limited role "does not require a reweighing of the evidence, but a determination whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157 (emphasis in original).

The court generally concurs with the government's contention that although Ms. Santiago's hypertension was an evident medical condition, her blood pressure taken alone was more often than not observed to be below the disabling threshold of 160/100. *See supra*, at 227 n. 14. The record shows that *medication at times was effective in lowering* Ms. Santiago's blood pressure. However, two matters in her medical records are troubling. The first is a narrative evaluation provided by Dr. Mark Simmons for the MEBD. Pl.'s Med. Records Vol. II at 93–94; Pl.'s Cross–Mot. App. Ex. 7. Dr. Simmons was one of two doctors that ultimately signed Ms. Santiago's MEBD report in late October 2003. Pl.'s Cross–Mot. App. Ex. 5. In his narrative evaluation, which is included in the MEBD report, *see* Army Regulation 40–400, §§ 7–8, 7–24, Dr. Simmons stated that Ms. Santiago suffered from "[h]ypertension *with evidence of end organ damage.*" Pl.'s Med. Records, Vol. II at 93–94; Pl.'s Cross–Mot. App. Ex. 7 (emphasis added). Dr. Simmons explained that Ms. Santiago suffered from "multiple complex, chronic medical problems," of which the two "most active" were her diabetes and hypertension, "both of which [we]re currently not controlled despite 2 years of chronic, intensive evaluation and treatment at the Brooklyn VA Hospital." *Id.* This diagnosis indicates that Ms. Santiago's hypertension is causing harm to organs that perform or control bodily functions beyond those associated with her cardiovascular system. The second matter consists of extensive evidence in the record that Ms. Santiago's hypertension frequently is not controlled. Besides Dr. Simmons' report quoted above, other similar observations that Ms. Santiago's hypertension was "not controlled" were made in medical reports over a span of years. *See* AR II 200 (Primary Care Progress Note (Oct. 2, 2002)), 241 (Primary

Care Progress Note (Aug. 6, 2003)), 258 (Primary Care Progress Note (Feb. 5, 2003)), 300 (Primary Care Progress Note (Jan. 28, 2004)).[15] Ms. Santiago's responses at the formal PEB hearing are consistent with these references and with Dr. Simmons' diagnosis; she told the PEB that "Dr. Adler is trying to see how best he can control the rising [of my blood pressure] so he's been putting [me] on different medications to see what happens [and this is] around the third or fourth try." Pl.'s Cross–Mot. App. Ex. 18.

Notably, the PEB did not include in its findings nor did it adequately explain at the hearing whether it had considered the "end organ damage" associated with Ms. Santiago's hypertension or whether her hypertension was "controlled" or "uncontrolled." Although the PEB was under no obligation to "itemize all of the medical evidence that was before [it]," *Haskins v. United States*, 51 Fed.Cl. 818, 829 (2002); *see also Rebosky v. United States*, 60 Fed.Cl. 305, 312 (2004), the complete absence of any indication from the PEB as to its consideration of these matters casts doubt upon its decision to disregard hypertension in rating Ms. Santiago's disabilities. These concerns are not assuaged by the comment made by the Acting President of the PEB that "we never find hypertension unfitting; in most cases it's controlled, even if it's not perfectly controlled, it usually, it in itself would not prevent satisfactory performance of duties." Pl.'s Cross–Mot. App. Ex. 18.

In *Rebosky*, this court held that the failure of the Army Board for the Correction of Military Records ("ABCMR") to discuss a particular piece of evidence in its findings did not necessitate a remand for further proceedings. 60 Fed.Cl. at 312. Unlike *Rebosky*, however, where the ABCMR "presented a lengthy discussion of the bases of its decision," *id.* at 311, the court in this case is faced with the absence of any rationale for the PEB's decision regarding hypertension and the lack of any indication that the PEB actually considered relevant evidence. *See*

---

**15.** "AR II" refers to the third and fourth volumes of the *Administrative Record filed with the court* by the government.

*Randolph v. United States,* 31 Fed.Cl. 779, 784–87 (1994) (remanding a PEB decision to the Secretary of the Navy because the court could not determine whether the PEB had considered relevant and competent evidence); [16] *Pomory v. United States,* 39 Fed. Cl. 213, 215–16 (1997) (disability decision by USAPDA on remand upheld; the court previously had remanded the case, holding that a finding by the PEB, which varied from the MEBD's findings, was not supported by the record). In short, despite the fact that pursuant to Army regulations, the PEB must "include the rationale for the findings and recommendations on the DA Form 199 along with a statement of the reasons for finding a Soldier fit or unfit, and if unfit, the basis for the rating," Army Regulation 635–40, § 4–19.*l*(1), the PEB in Ms. Santiago's case failed to do so.

Based on this record, the PEB's decision to rate Ms. Santiago's hypertension as "not unfitting" and the USAPDA's affirmance of that decision are arbitrary for failing to consider and address relevant evidence. *See Randolph,* 31 Fed.Cl. at 784–87; *Wyatt v. United States,* 23 Cl.Ct. 314, 321 (1991) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Accordingly, the court holds that on this record the PEB's and USAPDA's determinations to disregard Ms. Santiago's hypertension in assigning a disability rating were arbitrary, capricious, and unsupported by substantial evidence.

### 3. Remand.

The Tucker Act authorizes this court "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2). RCFC 56.2 sets out the procedural framework for such an order. *See Metz,* 61 Fed.Cl. at 174–75.

Pursuant to this authority, the court remands this matter to the Secretary of the Army for action, through appropriate procedures, to re-evaluate Ms. Santiago's disability

rating and to explain the rationale for the Army's ultimate disability rating for Ms. Santiago pursuant to Army Regulation 635–40, § 4–19.*l.* In particular, if there is "[a] significant variance ... between the disability prescribed in block 8 of DA Form 199 and diagnoses or degree of impairment reflected in the MEBD proceedings," the decision on remand should address the reasons for the variance. *Id.* The Army is instructed to complete its proceedings on remand within six months from the date of this Opinion and Order. Pursuant to RCFC 56.2(a)(5), counsel for defendant shall provide a report to the court of the status of proceedings on remand every 90 days until the remand has been completed and the resulting report has been submitted to the court.[17]

### CONCLUSION

For the reasons set forth above, both the government's motion for partial dismissal and its motion for judgment on the administrative record are DENIED. Plaintiff's cross-motion for judgment on the administrative record is GRANTED IN PART. This case is remanded for six months to the Secretary of the Army for further proceedings consistent with the specific directions provided. All other proceedings in this case shall be STAYED during the period of remand.

IT IS SO ORDERED.

---

16. In *Randolph,* after the PEB reissued its decision on remand, the court affirmed the resulting decision on the ground that it was not arbitrary and capricious. *Randolph v. United States,* 31 Fed.Cl. 787, 793 (1994).

17. The results of the proceedings on remand are subject to this court's review. *See, e.g., Christian v. United States,* 60 Fed.Cl. 550, 551 (2004).