**Gloria SANTIAGO, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 05–800C.

United States Court of Federal Claims.

March 15, 2007.

Gloria Santiago, pro se, Staten Island, NY.

Claudia Burke, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, and Bryant G. Snee, Assistant Director, Commercial Litigation Branch. Of counsel were Lieutenant Colonel Joseph C. Fetterman and Major Jerrett W. Dunlap, United States Army Litigation Division, Department of the Army, Arlington, VA.

## OPINION AND ORDER

LETTOW, Judge.

This military disability case comes before the court for a second time following a decision on remand rendered by the Army's Physical Evaluation Board ("PEB"), addressing questions raised by the court in a prior decision, *Santiago v. United States*, 71 Fed. Cl. 220 (2006). Plaintiff Gloria A. Santiago, a Sergeant retired from the United States Army Reserve, renews her challenge to her disability rating as determined and redetermined by the Army's disability evaluation process. Ms. Santiago was placed on the

Army's Temporary Disability Retired List ("TDRL") on November 4, 2004, after the Army determined she was unfit for duty because of physical disabilities she developed while serving in the military. According to Ms. Santiago, she is entitled to receive a higher disability rating than that awarded to her. The thrust of Ms. Santiago's current claim is that the process by which her rating was assigned and confirmed was improper and that evidence pertaining to one of her medical conditions did not receive adequate consideration.

The government has submitted the administrative record of proceedings by the Army's PEB on remand. Ms. Santiago has moved for judgment upon that record. Pl.'s Mot. for Judgment on the Administrative Record and Pl.'s Resp. to Def.'s Status Report and Notice of Filing ("Pl.'s Mot."). The government, in turn, has filed a cross-motion for judgment upon the administrative record. Def.'s Resp. to Pl.'s Mot. for Judgment Upon the Administrative Record and Cross–Mot. for Judgment Upon the Agency Record ("Def.'s Cross–Mot."). A hearing was held on February 2, 2007, and the case is ready for disposition.

## BACKGROUND

Ms. Santiago enlisted in the United States Army Reserve on October 2, 1978. AR 50 (Enlistment or Reenlistment Agreement (Oct. 2, 1978)).[1] She thereafter regularly reenlisted and rose to the rank of Sergeant (E–5). *See* AR 56–81 (reenlistment documents); AR 200 (Orders C09–491367 (Sept. 10, 2004)); *see also* AR 42–46 (various memoranda reflecting commendations). Until the closing years of her service, Ms. Santiago received very good annual performance evaluations. *See e.g.,* AR 36–37 (NCO Evaluation Report (Mar. 21, 2001)).

Approximately at the beginning of 2001, Ms. Santiago began experiencing a deterioration in her physical condition that required "continued medical care and affected her ability to perform any military duties." AR 91 (Mem. from Col. Peter C. Wei for PEB (May 2, 2003)); *see* PX 19 (Letter from Dr. Andrew J. Adler, Dep't of Veterans Affairs ("VA") (July 22, 2002)) (stating that Ms. Santiago had been his patient since May 2001 and had been treated for a variety of "debilitating conditions" that "make it impossible for her to work").[2] Ms. Santiago was examined and treated by multiple physicians and was frequently placed on convalescent leave and was ordered hospitalized for short periods. PX 19 (Mems. from Dr. Barbara Colon for Commander, 300th Medical Co. (Jan. 29, 2001; Mar. 30, 2001)) (recommending convalescent leave from January 29, 2001 through February 11, 2001 and March 30, 2001 through April 12, 2001); AR 91 (Mem. from Col. Wei for PEB (May 2, 2003)).

### A. Prior Administrative Proceedings

Late in 2001, a medical evaluation board ("MEBD") was convened "to determine [Ms. Santiago's] retainability and deployability in the U.S. Army." *See* PX 19 (Mem. from Col. Frank J. DeGaetano for Kathy Hutton, West Point Medical Board Dept. (Dec. 19, 2001)); Army Regulation ("Army Reg.") 635–40, ¶¶ 4–8, 4–10; AR 138 (Mem. from Kathy Hutton, Physical Evaluation Board Liaison Officer ("PEBLO") to Commander, 300th Medical Co. (May 7, 2002)).

Army regulations require that a narrative summary of the patient's medical condition be prepared by an examining physician and included in the MEBD findings. Army Reg. 40–400, ¶¶ 7–8, 7–24; *see* AR 90 (Mem. from Hutton to Commander, 300th Medical Detachment (May 2, 2003)). Two narrative summaries of Ms. Santiago's medical condition were actually prepared. *See* AR 274–75 (Narrative evaluation of Dr. Victor McGlaughlin ("McGlaughlin Evaluation")

---

1. "AR" refers to the Administrative Record filed with the court, both as originally constituted and as supplemented on remand.

2. "PX" and "Pl.'s Med. Records" refer to records and documentary materials provided by plaintiff, either as exhibits submitted as an appendix to Plaintiff's Response to Defendant's Motion and Cross Motion for Judgment filed during the prior proceedings before the court ("Pl.'s First Cross–Mot.") or as part of a two-volume compilation of her medical records from 1979–2004, which records had been before the PEB. The government previously accepted that these materials constituted proper elements of the administrative record. *See Santiago,* 71 Fed.Cl. at 224 n. 7.

(2003)); Pl.'s Med. Records Vol. II at 93–94 (Narrative evaluation of Dr. Mark Simmons ("Simmons Evaluation") (May 17, 2002)). Both the Simmons Evaluation and the McGlaughlin Evaluation identified a number of medical conditions that adversely affected Ms. Santiago. The Simmons Evaluation noted, among other things, Ms. Santiago's "uncontrolled hypertension," a blood pressure of 212/120, and an "abnormal" ophthalmologic examination. Pl.'s Med. Records Vol. II at 93. Based on "[h]ypertension with evidence of end organ damage," the Simmons Evaluation concluded that "[t]he patient does not meet retention standards." Id. at 94. The McGlaughlin Evaluation referred to Ms. Santiago's "hypertension" as being "poorly controlled" and reported a blood pressure reading of 130/100. AR at 274–75. The McGlaughlin Evaluation also concluded that Ms. Santiago's hypertension caused her to "not meet retention standards." Id. at 275. Both the Simmons Evaluation and the McGlaughlin Evaluation cited Paragraph 3–23a of Army Regulation 40–501 as the basis for concluding that hypertension caused Ms. Santiago not to meet retention standards. Pl.'s Med. Records Vol. II at 94; AR at 275.[3]

On October 27, 2003, the MEBD issued its findings with respect to Ms. Santiago's medical condition, which findings were accepted by the approving authority on November 4, 2003. See PX 5 (MEBD proceedings); see also AR 274–75 (McGlaughlin Evaluation). The MEBD identified four medical conditions—diabetes mellitus, hypertension, chronic lower back pain, and migraine headaches—as independently causing Ms. Santiago to fail to meet retention standards. PX 5 (MEBD proceedings); AR 235 (same); see generally Army Reg. 40–501. Consequently, the MEBD referred Ms. Santiago to a Physical Evaluation Board ("PEB"). PX 5 (MEBD proceedings); see Army Reg. 635–40, ¶¶ 4–10, 4–13.[4]

Among other things, a PEB is charged with "[i]nvestigating the nature, cause, [and] degree of severity ... of the disability" and "[e]valuating the physical condition of the Soldier against the physical requirements of the Soldier's particular office, grade, rank or rating." Army Reg. 635–40, ¶ 4–17a(1)–(2). An informal PEB issued its findings and recommendations for Ms. Santiago and concluded that she should receive a disability rating of 20% for diabetes, 20% for chronic lower back pain, and 10% for migraine headaches. PX 17 (informal PEB proceedings (Mar. 16, 2004)); AR 176–78 (same); see also Army Reg. 635–40, ¶ 4–20a (providing procedure for an informal PEB). Based on the Army's formula for calculating a disability percentage, the PEB assigned Ms. Santiago a disability rating of 40%. PX 17 (informal PEB proceedings (Mar. 16, 2004)).[5] The informal PEB went on to find that Ms. Santiago's other medical conditions, including her hypertension, were "medically acceptable." Id. Ms. Santiago did not concur with the informal PEB's decision, and, as the regulations allowed, she submitted a rebuttal statement and requested a formal PEB hearing pursuant to Army Regulation 635–40, ¶¶ 4–20e(6) and 4–21a(1). PX 17 (informal PEB proceedings); AR 176–180 (informal PEB proceedings).

A formal PEB hearing was conducted on May 19, 2004, at which the formal PEB

3. Army Regulation 40–501, ¶ 3–23a, provides that "[t]he causes for referral to an MEB[D] [include] [h]ypertensive cardiovascular disease and hypertensive vascular disease. Diastolic pressure consistently more than 110 mmHg following an adequate period of therapy in an ambulatory status."

4. As stated in Santiago,

[a]n MEBD is 'convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Soldier's status.... If the MEBD determines the Soldier does not meet retention standards, the board will recommend referral of the Soldier to a [Physical Evaluation Board]' which will determine if [the] particular Soldier should be separated or retired from the Army because of a disability.
71 Fed.Cl. at 222–23 n. 3 (quoting Army Reg. 635–40, ¶ 4–10).

5. As explained in Santiago, 71 Fed.Cl. at 224 n. 9, the Army calculates the combined percentage rating by rounding the difference between 100 percent and the product of the complementary percentages for each individual disability rating (i.e., 100%−((100%−20%) × (100%−20%) × (100%−10%)) = 42.4%, which is rounded down to 40%). See Army Reg. 635–40, App. B ¶ B–12; Hr'g Tr. at 23:18 to 24:17 (Mar. 15, 2006).

considered Ms. Santiago's medical records, the findings of the MEBD, and various documents provided by Ms. Santiago. AR 181–83 (formal PEB proceedings (May 19, 2004)); PX 18 (audio recording of the formal PEB proceeding). Although Ms. Santiago objected to the exclusion of hypertension from the listing of disabling conditions, the formal PEB affirmed the findings of the informal PEB, awarded Ms. Santiago a disability rating of 40%, and placed her on the TDRL. AR 181–83 (formal PEB proceedings (May 19, 2004)); PX 18 (audio recording of formal PEB proceeding). The formal PEB agreed with the informal PEB that Ms. Santiago suffered from hypertension but that it alone did not render her unfit for duty. *See* AR 181–83 (formal PEB proceeding (May 19, 2004)); PX 18 (audio recording of formal PEB proceeding).[6]

Ms. Santiago filed a rebuttal to the findings of the formal PEB, AR 186–90 (Rebuttal (May 27, 2004)); *see* Army Reg. 635–40, ¶¶ 4–21s–t, but the PEB affirmed its decision. AR 191–93 (Mem. for Ms. Santiago from Col. James F. Babbitt, PEB President (June 10, 2004)); *see* Army Reg. 635–40, ¶ 4–21t(2). Subsequently, the PEB forwarded the matter to the U.S. Army Physical Disability Agency ("USAPDA") because Ms. Santiago did not concur with the formal PEB's findings. *See* AR 207 (Letter from Lt. Col. Richard L. Rankin, USAPDA, to Ms. Santiago (July 20, 2004)); *see* Army Reg. 635–40, ¶ 4–22a(3). USAPDA ultimately affirmed the formal PEB findings, AR 207, and forwarded the case to the U.S. Army Human Resources Command for final disposition. *See* AR 200 (Orders C–09–491367 (Sept. 10, 2004)). Effective November 3, 2004, after having served over 20 years in the Army, AR 199 (Chronological Statement of Retirement Points (May 1, 2003)), Ms. Santiago was "released from assignment and duty because of physical disability" and placed on the TDRL with a disability rating of 40%. AR 200 (Orders C–09–491367 (Sept. 10, 2004)).

### B. *Prior Judicial Decision*

Promptly thereafter, on November 10, 2004, Ms. Santiago filed suit against the Army in the U.S. District Court for the Eastern District of New York. *See Santiago v. United States Army*, 2005 WL 1250281, at *2 (E.D.N.Y. May 26, 2005). After the Army moved to dismiss that action, the District Court concluded that it did not have subject matter jurisdiction to entertain Ms. Santiago's claims. *Id.* at *4. However, it held that this court would have jurisdiction under 28 U.S.C. § 1491 and ordered the case transferred to this court pursuant to 28 U.S.C. § 1631. *Id.* After transfer, Ms. Santiago filed her complaint in this court on August 22, 2005.

Examining whether the PEB's disability rating decision for Ms. Santiago was arbitrary, capricious, unsupported by substantial evidence, or contrary to law, this court determined that the administrative record then before the court was void of "any rationale for the PEB's decision regarding hypertension" and lacked "any indication that the PEB actually considered relevant evidence." *Santiago*, 71 Fed.Cl. at 229. The court particularly pointed to Dr. Simmons's narrative evaluation for the MEBD, reporting "[h]ypertension with evidence of end organ damage," *id.; see* Pl.'s Med. Records, Vol. II at 93–94, and extensive evidence in the record that Ms. Santiago's hypertension frequently is not controlled, citing AR II 200 (Primary Care Progress Note (Oct. 2, 2002)), 241 (Primary Care Progress Note (Aug. 6, 2003)), 258 (Primary Care Progress Note (Feb. 5, 2003)), 300 (Primary Care Progress Note (Jan. 28, 2004)). *Santiago*, 71 Fed.Cl. at 229.[7] Accordingly, the court remanded the matter to the Secretary of the Army to re-evaluate Ms. Santiago's disability rating and to explain the rationale for the Army's ultimate disability rating for her. *Id.* at 230. The court asked the Army on remand to

---

6. During the formal PEB hearing, the Acting President of the PEB noted that the informal PEB's description of hypertension in its findings as "medically acceptable" was incorrect; rather, that particular disability should have been described as "not unfitting." PX 18 (formal PEB proceeding (May 19, 2004)).

7. "AR II" refers to the third and fourth volumes of the Administrative Record filed with the court by the government.

address, in accord with Army Regulation 635–40, § 4–19.l, any " 'significant variance . . . between the disability prescribed in block 8 of DA Form 199 [PEB proceedings] and diagnoses or degree of impairment reflected in the MEBD proceedings.' " *Id.*

### C. *Administrative Proceedings on Remand*

On remand, the PEB reviewed Ms. Santiago's case and documented its findings in a memorandum. *See* Def.'s Status Report (filed Sept. 15, 2006) at Attach. 1 ("PEB Mem." (Jul. 14, 2006)). The PEB recited that it had "reviewed the entire record considered [by this court] and provided by the Physical Disability Agency Legal Counsel." PEB Mem. ¶ 2. The PEB found "no evidence to indicate that the hypertension by itself was an unfitting condition." *Id.* ¶ 3. It concluded that "[h]ypertension did not of itself reduce the physical capacity of this Soldier in her military occupational specialty and assignment." *Id.* In this connection, the PEB determined "[t]here does not appear to be any of the generally recognized complications from hypertension." *Id.* ¶ 5(a). The PEB addressed Dr. Simmons's diagnosis of hypertension end-organ damage and found that "Dr. Simmons [did] not offer any support for [his] conclusion." *Id.* ¶ 5(c). The PEB also relied upon an eye examination of September 14, 2004, which examination the PEB stated did not disclose "classical hypertensive blood vessel changes (that also may be seen as a result of diabetes)." *Id.* Furthermore, the PEB construed Dr. Simmons's diagnostic report as indicating "normal heart," "normal neurological," and "normal kidney function[s]." *Id.* The PEB observed that a reading of Ms. Santiago's blood pressure while she was medicated "suggest[ed] she had controlled, although not ideally controlled, hypertension." *Id.* ¶ 5(d). The PEB also stated that

> [t]here is no record of this soldier being hospitalized for her hypertension, as does happen in some cases where the hypertension is totally out of control. . . . The PEB could not find any letter from the VA to support her husband's statement that she was hospitalized at the Brooklyn VA for

observations because of hypertension concerns.

PEB Mem. at Annex. The PEB summarized its findings that "[b]ased upon a full review of all the documents provided, it is the PEB's opinion that the Soldier's hypertension was not independently unfitting at the time of her formal board in 2004." PEB Mem. ¶ 6.

### STANDARD FOR DECISION

The results of the Army PEB's proceedings on remand are subject to this court's review. *See, e.g., Pomory v. United States,* 39 Fed.Cl. 213, 215–16 (1997); *Randolph v. United States,* 31 Fed.Cl. 787, 789–90 (1994). The parties each seek judgment on the administrative record under Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"). In accord with RCFC 52. 1, the court "is required to make factual findings . . . from the record as if it were conducting a trial on the record." *Acevedo v. United States,* 216 Fed.Appx. 977, 2007 WL 445004, *1 (Fed.Cir.2007); *see also Bannum, Inc. v. United States,* 404 F.3d 1346, 1355–57 (Fed.Cir.2005) (construing and applying former RCFC 56. 1, abrogated and superseded by RCFC 52.1); *Comprehensive Health Services, Inc. v. United States,* 70 Fed.Cl. 700, 722 (2006).

In military cases, this court's role is limited. *Santiago,* 71 Fed.Cl. at 226. "It has long been established that it is 'beyond the institutional competence of courts to review' the substance of decisions that have been left exclusively to the discretion of the military." *Roth v. United States,* 56 Fed.Cl. 239, 244 (quoting *Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002)); *see Groves v. United States,* 47 F.3d 1140, 1144 (Fed.Cir. 1995). "It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983). The standard of review due the disposition of a military disability evaluation board is whether the decision was "arbitrary, capricious, not supported by substantial evidence, or contrary

to applicable statutes and regulations." *Bernard v. United States,* 59 Fed.Cl. 497, 501 (2004), *aff'd,* 98 Fed.Appx. 860, 862 (Fed.Cir. 2004); *see Heisig,* 719 F.2d at 1156; *Poole v. United States,* 64 Fed.Cl. 776, 781 (2005) (applying RCFC 56. 1, abrogated and superseded by RCFC 52.1); *see also Fisher v. United States,* 402 F.3d 1167, 1180–81 (Fed. Cir.2005).

Ms. Santiago "bears the burden of establishing by 'cogent and clearly convincing evidence'" that the Army's decision is not supported by substantial evidence. *See Colon v. United States,* 71 Fed.Cl. 473, 484 (2006) (citing *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986)), *aff'd sub nom. Acevedo v. United States,* —— Fed.Appx. ——, 2007 WL 445004 (Fed.Cir.2007).

## ANALYSIS

Plaintiff contends that the PEB's reconsidered decision is arbitrary, capricious, and unsupported by substantial evidence. Pl.'s Mot. at 1, 10. According to Ms. Santiago, the Army has failed adequately to address this court's directions on remand with regard to hypertension and end-organ damage. *Id.* at 10. The government argues that the PEB's reconsidered decision is supported by substantial evidence. Def.'s Cross–Mot. at 5, 14. The government concedes that "obviously Ms. Santiago suffers from hypertension," but it urges the court to accept PEB's ultimate conclusion that hypertension would not independently render Ms. Santiago unfit for duty. Hr'g Tr. 25:17–22 (Feb. 2, 2007). Specifically, the government maintains that the PEB "fully explained Dr. Simmons's narrative and determined that it did not support a finding of additional disability for hypertension." Def.'s Cross–Mot. at 5. The government contends that the PEB's conclusion that Ms. Santiago's hypertension was "controlled, although not ideally controlled," is

"supported by substantial evidence." *Id.* at 8.

On remand, the PEB stated it "reviewed the entire record" and concluded Ms. Santiago did "not appear to [have] any of the generally recognized complications from hypertension." PEB Mem. ¶¶ 2, 5(a). This finding provided the basis for the PEB's determination that Ms. Santiago's "hypertension was not independently unfitting at the time of her formal board in 2004." *Id.* ¶ 6. The PEB recognized that the Simmons Evaluation reached a contrary conclusion, but the PEB determined that Dr. Simmons's diagnoses of hypertension and end-organ damage were without evidentiary support. *Id.* ¶ 5(c). Specifically, the PEB found the Simmons Evaluation to indicate "normal heart," "normal neurological," and "normal kidney func-tion[s]." *Id.*

In light of the PEB's remand proceedings, Ms. Santiago here focuses on a claim of end-organ damage but emphasizes "that there is eye damage that is related to the hypertension that is not related to the diabetes." *See* Hr'g Tr. 14:2–5 (Feb. 2, 2007). In this latter regard, the PEB stated that an eye examination conducted on Ms. Santiago on September 14, 2004 "does not note any classical hypertensive blood vessel changes." PEB Mem. ¶ 5(c). "[S]heathed [blood vessels] temporally out to periphery [in both eyes]" were noted in the record of this examination. *See* AR II at 315–16 (Medical Record of Eye Clinic Follow–Up Examination signed by Evan Canellos, O.D. (Sept. 14, 2004)). However, the PEB explained that blood vessel changes in the eyes "also may be seen as a result of diabetes." PEB Mem. ¶ 5(c). Indeed, Dr. Canellos's own assessment of Ms. Santiago's condition was "NPDR" or non-proliferative diabetic retinopathy. AR II at 315.[8] Diagnosing the condition afflicting Ms.

---

8. The plaintiff urges the court to look to an eye examination conducted on January 26, 2006, as evidence of hypertensive retinopathy. Tr. 12:13–18, 13:6–8 (Feb. 2, 2007); Pl.'s Resp. to Def.'s Cross–Mot. at 11, Encl. 30 (Medical Record for Ms. Santiago signed by Victoria Bolbirer, O.D. (Jan. 26, 2006)) (containing a diagnosis of hypertensive retinopathy and noting "silver wiring" on both retinas). This evidence is not pertinent to this proceeding because this court is reviewing

the PEB redetermination of Ms. Santiago's condition as of her placement on the TDRL in 2004. Army Reg. 635–40, ¶ 7–20(b); *see also Pomory,* 39 Fed.Cl. at 220 n. 11; *Slesinski v. United States,* 34 Fed.Cl. 159, 164 (1995). This evidence, however, might be relevant to whether an adjustment should be made to her combined percentage rating "at the time of her removal from the TDRL to reflect the degree of severity of those conditions rated at the time of placement

Santiago's eyes as either hypertensive retinopathy or a form of diabetic retinopathy is outside both the province and the competence of this court. It cannot be said that the PEB's decision in this regard is unsupported by substantial evidence. *Heisig,* 719 F.2d at 1157. By addressing the contents of the Simmons Evaluation, the PEB has satisfied this court's query as to whether the Simmons Evaluation, as relevant evidence, had been considered. *See Randolph,* 31 Fed. Cl. at 791.

On remand, as requested by this court, the PEB also addressed the question of whether Ms. Santiago's hypertension was controlled or uncontrolled. PEB Mem. ¶ 5(d). In support of the PEB's conclusion that Ms. Santiago's hypertension was "controlled, although not ideally controlled," *id.,* it relied on various blood pressure readings that the PEB described as "controlled." PEB Mem. ¶ 5(d) (referring to "a physical exam (5/02/03) reporting a BP of 130/100," "a 9/29/[ ]03 BP of 150/90," and "an afternoon BP of 160/90" taken January 28, 2004); *see* Pl.'s Med. Records Vol. II at Tab B (Emergency Care & Treatment record signed by Lourival Passini, M.D. (May 2, 2003)) (reporting blood pressure reading as 153/94); AR II at 304 (Medical Record (Jan. 26, 2004)) ("BP: 150/90 (09/29/2003 13:27)"); AR II at 296 (Medical Record (Jan. 28, 2004)) ("BP=160/90

(01/28/2004 14:07)").[9] Respecting the reading of January 28, 2004, the PEB explained that blood pressure readings "tend to be slight[ly] higher in the afternoons." PEB Mem. ¶ 5(d). The PEB acknowledged there was "an elevated blood pressure" reading on March 26, 2002, the same date for which "the clinical note also reports 124/74—a normal BP." *Id.; see* Pl.'s Med. Records at Tab A (Emergency Care & Treatment record signed by Laura Fitzsimmons, RPA-C (Mar. 26, 2002)) (reporting blood pressure readings of 194/103, 194/99, 175/102, 190/130, and 124/74); Pl.'s Med. Records at Tab A (Notes of Mark L. Simmons, M.D. (Mar. 26, 2002)) (reporting blood pressure readings of 212/120 and 190/130). Although there is definite evidence of high readings, the PEB's medical analysis of Ms. Santiago's blood pressure data accords with this court's prior observation that Ms. Santiago's "blood pressure taken alone was more often than not observed to be below the disabling threshold of 160/100." *Santiago,* 71 Fed.Cl. at 229, 227 n. 14.[10] The PEB also noted that "it appears that the soldier was on medications [on January 28, 2004], thus suggesting she had controlled, although not ideally controlled, hypertension." PEB Mem. ¶ 5(d).

The PEB unquestionably erred in one respect on remand, overlooking Ms. Santiago's

---

9. According to the PEB, "[t]he record of 8/23/03 shows the Soldier is receiving two medications and the blood pressure is 130/100. Certainly this is not out of control." PEB Mem. ¶ 5(d). The court has been unable to locate this particular record in the administrative record. Nonetheless, in view of the PEB's discussion of other evidence, this singular omission is immaterial to the court's review of the Army's ultimate determination as to whether Ms. Santiago's hypertension was independently unfitting. The "substantial evidence standard" requires a determination being reviewed to be sustained "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the [agency's] conclusion." *Nippon Steel Corp. v. United States,* 458 F.3d 1345, 1352 (Fed.Cir.2006) (citation omitted).

10. A review of Ms. Santiago's medical records demonstrates that there were many instances of

on the TDRL and any ratable conditions identified since placement on the TDRL." Army Reg. 635-40, ¶¶ 7.4, 7-20(b), App. C ¶ C-10g, App. D ¶ D-8b(6)(a). That question is not before this court.

Ms. Santiago's blood pressure being read below 160/100. *See, e.g.,* AR II at 201 (Medical Record (Oct. 2, 2002)) ("BP=152/96"); 216 (Medical Record (Jul. 26, 2002)) ("BP: 140/90"); 222 (Medical Record (Jul. 17, 2002)) ("BP=140/88"); 225 (Medical Record (Jul. 16, 2002)) ("[BP] 180 90 came down to 152 80 after felodipine 2.5 mg po was given"); 241 (Medical Record (Aug. 6, 2003)) ("BP 150/88"); 251 (Medical Record (Mar. 12, 2003)) ("BP 128/70"); 280 (Medical Record (Apr. 12, 2004)) ("BP 146/85"); 339 (Medical Record (June 21, 2004)) ("BP:120/84"); 346 (Medical Record (May 12, 2004)) ("BP 122/88"). Although these readings were not cited in the PEB memorandum produced on remand, that does not mean the PEB did not consider them. *Rebosky v. United States,* 60 Fed.Cl. 305, 312 (2004) ("[W]hile an agency has a duty to consider all evidence, '[i]t does not necessarily follow ... that the failure to mention certain evidence means that it was not considered.' ") (quoting *Lorion v. United States Nuclear Regulatory Comm'n,* 785 F.2d 1038, 1042 (D.C.Cir. 1986)).

July 2002 hospital stay for observation. *Compare* PEB Mem. at Annex ("There is no record of this soldier being hospitalized for her hypertension."), *with* Pl.'s Med. Records at Tab A (Letter from Dr. Judy Amalanathan, Staff Physician, Dept. of Veterans Affairs (Jul. 16, 2002)) ("Ms. Santiago ... was evaluated in the ER ... and has been admitted to 23hr observation for uncontrolled Diabetes [M]ellitus and Hypertension."). Notably, the medical record recites that this hospital stay observation was caused by both "[d]iabetes [m]ellitus and [h]ypertension." Pl.'s Med. Records at Tab A (Letter from Dr. Amalanathan (Jul. 16, 2002)). Ms. Santiago's twenty-three hour hospital stay for observation, *id.*, does not fatally undercut the PEB's conclusion that Ms. Santiago's hypertension was "controlled, although not ideally controlled." PEB Mem. ¶ 5(d); *see Heisig*, 719 F.2d at 1157. The PEB acknowledged that hospitalization "does happen in some cases where the hypertension is totally out of control." PEB Mem. at Annex. The court does not "reweigh[ ] ... the evidence" but rather "determin[es] whether *the conclusion being reviewed* is supported by substantial evidence." *Heisig*, 719 F.2d at 1157; *Skinner v. United States*, 219 Ct.Cl. 322, 594 F.2d 824, 830 (1979) (the court does not sit as "a super correction board"). As a result, the court is satisfied that the Army has considered and addressed the question of whether Ms. Santiago's hypertension was controlled or uncontrolled. It can no longer be said that the Army failed to adequately consider this important issue which needed to be addressed as part of its decision. *See Rominger v. United States*, 72 Fed.Cl. 268, 273 (2006).

The court also finds that the Army has addressed the variance between the MEBD findings and the ultimate findings of the PEB. For the reasons stated, this court holds that the PEB's decision upon remand is not arbitrary, capricious, or unsupported by substantial evidence. *See Heisig*, 719 F.2d at 1156.

## CONCLUSION

For the reasons set forth, the plaintiff's motion for judgment on the administrative record is DENIED, and the government's cross-motion for judgment on the administrative record is GRANTED. The Clerk is directed to enter judgment accordingly.

No costs.

It is so ORDERED.