**MISSION ESSENTIAL PERSONNEL, LLC, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Harding Security Associates, Inc., Intervening Defendant.**

**No. 12–33C.**

United States Court of Federal Claims.

Filed Under Seal March 23, 2012.

Reissued March 28, 2012.

Craig A. Holman, Arnold & Porter LLP, Washington, D.C., for plaintiff. With him on the briefs were Kara L. Daniels and Steffen G. Jacobsen, Arnold & Porter LLP, Washington, D.C.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, and Jeanne E. Davidson, Director, and Reginald T. Blades, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Jennifer S. Zucker, Wiley Rein LLP, Washington, D.C., for defendant-intervenor. With her on the briefs were Jon W. Burd, Thomas J. Warren, and Tara L. Ward, Wiley Rein LLP, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Judge.

This is a post-award bid protest of an agency's corrective action following an earlier protest before the Government Accountability Office ("GAO"). Plaintiff Mission Essential Personnel, LLC ("Mission Essential") had challenged the award of two task orders issued by the Department of the Army ("Army" or "agency") for intelligence support services primarily in Afghanistan under previously entered Indefinite Delivery Indefinite Quantity ("IDIQ") contracts. During the GAO proceedings, the Army volunteered to take corrective action, which it believed would moot the protest. Mission Essential regards this corrective action as defective and seeks redress in this court.

The initial awardee, Harding Security Associates, Inc. ("Harding Security," "Harding," or "defendant-intervenor"), intervened as a defendant. Thereafter, the United States ("the government") and Harding Security filed motions to dismiss the case for lack of jurisdiction, arguing that the protest was barred by 10 U.S.C. § 2304c(e), which prohibits judicial consideration of protests in connection with the issuance of task orders. Mission Essential disputed this assertion, but the corrective action proceeded and new task orders were issued. When Mission Essential received nearly all of the new orders, it filed a notice of voluntary dismissal of the action pursuant to RCFC 41. The case is now in an unusual posture: all three parties concur that the case should be dismissed, but they cannot agree on *how* the court procedurally should direct the dismissal.

1. Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this action, it was initially filed under seal. The parties were requested to review this decision and to provide proposed redactions of any confidential or proprietary information on or before March 28, 2012. The resulting redactions are represented by asterisks enclosed within brackets, *i.e.,* "[* * *]." In addition, several modifications to citations were made in the opinion.

## FACTS[2]

On September 22, 2010, the Army issued three multiple-award IDIQ contracts [3] for intelligence support services in Afghanistan. AR 27–318, –337.[4] The recipients of the three IDIQ contracts were Mission Essential, Harding Security, and L–3 Services, Inc. ("L–3"). AR 27–318. The requests for proposals that led to the contracts stated that the Army would consider two factors when competing task orders among the awardees: current contract performance and price. AR 19–221. Current contract performance would be evaluated "on a Go/No Go basis." *Id.*[5] Assuming multiple contract holders met this performance threshold, the Army would award task orders on the basis of price. *Id.*

On July 6, 2011, the Army issued a task-order request for proposals ("TORFP" or "taskorder request") for various intelligence services. AR Tab 6.[6] The TORFP asked the contract holders to submit prices for 35 Contract Line Item Numbers ("CLINs"). AR 6–121 to –122.[7] Thirty-two of these CLINs were specific positions, such as senior intelligence analyst or information management specialist. *Id.* Three CLINs addressed additional costs associated with each position: mobilization, insurance, and other direct costs. AR 28–359; AR 29–365. The taskorder request advised that the Army could award multiple task orders to obtain the best value at the CLIN level, rather than awarding a single task order based on the lowest overall price for all the CLINs. AR 6–121.[8] At some point after issuing the task-order request, the Army decided to procure the services using separate task orders with partially overlapping CLINs. *See* AR 28–359; AR 29–366.

Each of the contract holders submitted an offer. *See* AR 28–359; AR 29–365. All three received a satisfactory technical rating, and consequently the award was made on the basis of the prices proposed. AR 28–359; AR 29–365. The Army divided the 32 labor

**2.** The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement and the parties' evidentiary submissions. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir. 2005) (bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed. Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'" (omission in original) (quoting *Acevedo v. United States*, 216 Fed.Appx. 977, 979 (Fed.Cir.2007))).

**3.** In an IDIQ contract, the government does not initially purchase specific services from the contractor. *See* 48 C.F.R. § ("FAR") 16.504(a). Rather, the government promises that it will eventually order a minimum amount of services, and it may acquire additional services beyond the specified minimal amount. FAR 16.504(a)(1). In a multiple-award IDIQ contract, the government issues contracts to two or more contractors pursuant to a single solicitation. *See* FAR 16.504(c). Thereafter, instead of issuing a task order to a particular contractor, the government competes the task order among all the contract holders. FAR 16.505(b).

**4.** The administrative record is comprised of numbered tabs with consecutive pagination independent from the tabs. Thus, "AR 5–100" reflects a part of Tab 5 which is the 100th page from the beginning of the entire administrative record.

**5.** If a contractor had performed satisfactorily on previous IDIQ task orders, it would receive a "Go" rating and thus be eligible for award. AR 19–221. If the contractor's prior performance under the contract caused the Army to doubt its capability, the contractor would receive a "No Go" and would no longer be considered for a task order. *Id.*

**6.** The Army originally issued the task-order request on March 15, 2011, and subsequently revised or rescinded the TORFP three times before finally settling on a version issued July 6, 2011. *See* AR 4–117; AR 5–119, –121. The previous versions of the task-order request are not relevant to this protest.

**7.** Originally, 36 CLINs were identified. AR 6–121 to –122. At some point, however, the Army determined that it did not require one of these CLINs, and the Army did not consider it in the final price evaluation. *Compare id., with* AR 28–359 *and* AR 29–365 (omitting CLIN "0001 CE CONUS ODCs").

**8.** To illustrate, assume that Contractor *A* offered the services of an analyst for $300 and those of a specialist for $100, and that Contractor *B* proposed the same positions for $200 and $150, respectively. Even though Contractor *B*'s overall price for these two positions ($350) is lower than *A*'s ($400), the Army would not award the task order in its entirety to *B*. Rather, it would issue two task orders, purchasing the analyst services from Contractor *B* for $200 and the specialist services from *A* for $100.

categories among the three contract holders, ostensibly awarding each position to whichever offeror bid the lowest price for that particular CLIN. *See* AR 28–359; AR 29–365. Mission Essential and L–3 each received 19 positions, and Harding Security was awarded 219 positions. AR 28–359; AR 29–365.

Mission Essential filed a protest with GAO on October 24, 2011. AR Tab 2. Among the various grounds alleged in its protest, Mission Essential argued that the Army failed to conduct a proper price comparison among the offers. AR 2–25 to –26. In determining the lowest bid for a particular position, the Army looked solely at the price submitted for that CLIN. Mission Essential argued that the correct measure was actually the CLIN price *plus* the pro rata sum of the mobilization, other direct costs, and insurance CLINs. AR 38–406. These latter items represented costs that the Army was obliged separately to pay for each position filled by the contractor. *Id.* [* * *]. *See, e.g.,* AR 29–365.[9] Mission Essential identified five CLINs awarded to Harding Security where Mission Essential's bid would have been lower than Harding Security's had the Army factored in this difference. AR 38–411.

In late December 2011, the Army announced that it would take voluntary corrective action. AR 41–432. Specifically, it stated that it would recompete eight of the CLINs: the five listed by Mission Essential and three others in which the two offerors' bids were close. *Compare* AR 42–434, *with* AR 28–359, AR 29–365, *and* AR 38–411. Mission Essential regarded this corrective action as inadequate, arguing that the Army had essentially admitted that Mission Essential had offered the lowest price for these positions. AR 43–435. Mission Essential contended that the Army should either award the contested positions to Mission Essential or resolicit all the CLINs covered by Task Orders 2 and 3. AR 43–436. On Janu-

ary 6, 2012, after a flurry of briefing by the parties, GAO ruled that the Army's proposed corrective action was appropriate and dismissed the protest. AR 48–471. The Army then issued a start-work order to Harding Security for all CLINs it was originally awarded, save the eight which the Army intended to recompete.

## PROCEEDINGS IN THIS COURT

Mission Essential filed its protest in this court on January 17, 2012. In its complaint, it alleged that the Army's corrective action violated 10 U.S.C. § 2305(f) and amounted to unequal treatment in contravention of 48 C.F.R. § 1.602–2(b). Compl. ¶ 1. Mission Essential asked the court to enjoin the agency from issuing a new task-order request for the eight contested CLINs, Compl. ¶ 4, and to order the Army either to re-award the positions based on the offerors' original price proposals or recompete all 35 CLINs. *Id.* After the filing of the administrative record of the procurement proceedings conducted by the Army and the protest proceedings before GAO, Mission Essential filed a motion for judgment on the administrative record on January 30, 2012. *See* Pl.'s Mot. for Judgment on the Admin. Record ("Pl.'s Mot.").

Mission Essential coupled the filing of that motion with a concurrent submission of an application for a temporary restraining order ("TRO") to prevent the agency from awarding the eight CLINs in contention.[10] The following day the court held a hearing on the application and denied temporary relief. Order of Jan. 31, 2012, ECF No. 32. While the court questioned the propriety of the Army's corrective action, it also expressed doubts concerning its own jurisdiction over the case due to 10 U.S.C. § 2304c(e). That statute limits the court's jurisdiction over protests "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 2304c(e)(1).[11] Because Mission Es-

---

**9.** [* * *]. *See, e.g.,* AR 24.2–279; AR 44–449.

**10.** Mission Essential had originally declined to seek a TRO or preliminary injunction in the interests of resolving the case expeditiously. *E.g.,* Hr'g Tr. 36:6–9 (Jan. 20, 2012). However, Mission Essential changed course when it learned the Army intended to re-award the eight

CLINs in question by February 3, 2012. Hr'g Tr. 5:11–21 (Jan. 31, 2012); *see also* AR Tab 52 (Amended TORFP 12–01 for Intelligence Support Services–Afghanistan (Jan. 19, 2012)).

**11.** In relevant part, this statute provides that:

sential's protest might be determined to fall within the ambit of this law, the court determined that a TRO would be inappropriate.

On February 9, 2012, the Army issued Task Order 12–01, which encompassed all eight of the CLINs subject to the corrective action. *See* Def.'s Mot. to Dismiss or, in the Alternative, Cross–Mot. for Judgment on the Admin. Record ("Def.'s Mot. to Dismiss") at 8; *see also* AR Tab 52. Mission Essential won seven of them, garnering 44 of the 45 solicited positions. Def.'s Mot. to Dismiss at 8.

On February 10, 2012, the government and Harding Security each filed cross-motions for judgment upon the administrative record, along with motions to dismiss for lack of jurisdiction. *See* Def.'s Mot. To Dismiss; Def.-Intervenor's Mem. in Support of HSA's Mot. to Dismiss Pl.'s Compl. for Lack of Jurisdiction, or in the Alternative, HSA's Cross–Mot. for Judgment on the Admin. Record ("Harding's Mot. to Dismiss"). The government and Harding argue that this court lacks jurisdiction because Mission Essential's protest is in connection with the issuance or proposed issuance of a task order. *E.g.*, Def.'s Mot. to Dismiss at 10–13. Mission Essential opposed these cross-motions on February 16, 2012, arguing that its protest is aimed at the Army's corrective action, not its issuance of the task orders. *See* Pl.'s Opp'n to Defs.' Mots. to Dismiss for Lack of Jurisdiction or, in the Alternative, Mots. for Judgment on the Admin. Record.

On the same day that it filed its brief opposing defendants' motions to dismiss, Mission Essential notified the court that it was voluntarily dismissing the case pursuant to RCFC 41(a)(1). Pl.'s Notice of Voluntary Dismissal Without Prejudice. Harding Security has objected to this notice, claiming that Mission Essential cannot avail itself of RCFC 41(a)(1) and that the court should instead dismiss the complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). *See* Def.-Intervenor's Reply in Support of its Mot. to Dismiss for Lack of Jurisdiction or, in the Alternative, Mot. for Judgment on the Admin. Record, and Objection to M[ission Essential]'s Notice of Voluntary Dismissal Without Prejudice. The government, however, does not object to plaintiff's voluntary withdrawal. Def.'s Resp. to Pl.'s Notice of Dismissal and Opp'n to Def.'s Mot. to Dismiss or, in the Alternative, Mot. for Judgment on the Admin. Record at 1.

In sum, all three parties want the case to be dismissed. The only point of contention is the means by which the court achieves that end, *i.e.*, pursuant to Mission Essential's notice of voluntary dismissal or pursuant to the motions to dismiss for lack of subject matter jurisdiction. After holding a hearing and receiving supplemental briefs on this issue, the dispute has been prepared for resolution.

## STANDARDS OF DECISION

### A. *Voluntary Dismissal Under RCFC 41(a)*

RCFC 41(a) provides a number of avenues by which a plaintiff may voluntarily dismiss its case. First, the plaintiff may cause dismissal as a matter of right by filing a notice with the court before the opposing party serves an answer or motion for summary judgment. RCFC 41(a)(1)(A)(i). Second, it can dismiss the case by presenting the court with a stipulation to that effect signed by all the parties to the litigation. RCFC 41(a)(1)(A)(ii). Lastly, the plaintiff may move the court to order the case dismissed. RCFC 41(a)(2).[12] In acting on a motion filed under Rule 41(a)(2), the court generally has discretion to either deny the motion or to grant it subject to "terms that the court considers proper." RCFC 41(a)(2); *see also*

(e) Protests.—(1) A protest is not authorized in connection with the issuance or proposed issuance of a task or delivery order except for—
    (A) a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued; or
    (B) a protest of an order valued in excess of $10,000,000.

(2) Notwithstanding section 3556 of title 31, the Comptroller General of the United States shall have exclusive jurisdiction of a protest authorized under paragraph (1)(B).
10 U.S.C. § 2304c(e)(1)–(2).

**12.** RCFC 41 mirrors the text of Fed.R.Civ.P. 41.

*Whyde v. United States,* 51 Fed.Cl. 635, 637 (2002) (citing *D'Alto v. Dahon Cal., Inc.,* 100 F.3d 281, 283 (2d Cir.1996)).

### B. Subject Matter Jurisdiction

"A federal court's jurisdiction must be established as a threshold matter before the court may reach the merits of any action." *Riser v. United States,* 93 Fed.Cl. 212, 215 (2010) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). As plaintiff, Mission Essential "bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed.Cir.2010) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988)); *see also McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In determining whether subject matter jurisdiction exists, the court "accepts as true the undisputed allegations in the complaint, and draws all reasonable inferences in favor of the plaintiff." *De Maio v. United States,* 93 Fed.Cl. 205, 209 (2010) (citing *Hamlet v. United States,* 873 F.2d 1414, 1415–16 (Fed.Cir.1989)).

## ANALYSIS

### A. Mission Essential's Notice of Voluntary Dismissal

■ A threshold inquiry in this case is whether Mission Essential can invoke RCFC 41(a)(1)(A)(i) to withdraw its case without prejudice on the ground that it has filed its notice of voluntary dismissal before the opposing parties have "serve[d] either an answer or a motion for summary judgment." RCFC 41(a)(1)(A)(i). During oral argument, Mission Essential claimed that it has satisfied this standard because neither the government nor Harding Security has filed an answer or motion for summary judgment. Hr'g Tr. 4:12–25 (Feb. 23, 2012). Harding Security countered that the parties' motions for judgment on the administrative record take the place of motions for summary judgment in the context of bid protests, and, as a result, that the time for dismissal as of right has expired with the prior filing of motions

for judgment by each of the three parties. Hr'g Tr. 17:14–25 (Feb. 23, 2012).

Mission Essential correctly notes that, in interpreting Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, federal courts have traditionally construed the requirement of an answer or motion for summary judgment quite literally. *See, e.g., In re Bath & Kitchen Fixtures Antitrust Litig.,* 535 F.3d 161, 166 (3d Cir.2008) ("[W]e apply the literal terms of Rule 41."); *In re Microsoft Corp. Antitrust Litig.,* 332 F.Supp.2d 890, 895 (D.Md.2004). *But see Harvey Aluminum, Inc. v. American Cyanamid Co.,* 203 F.2d 105, 107–08 (2d Cir.1953) (Augustus Hand, J.) (rejecting application of Fed.R.Civ.P. 41(a)(1) where the merits of the case had been addressed in a hearing on plaintiff's motion for a preliminary injunction which involved several days of argument and testimony, even though no answer or motion for summary judgment had been filed). Thus, courts have rejected the notion that a plaintiff's right of voluntary dismissal might be terminated by, *inter alia,* a motion to dismiss, a motion for preliminary injunctive relief, or discovery proceedings. See 8 James Wm. Moore, et al., *Moore's Federal Practice* § 41.33[5][c][vii] (3d ed.2011).

Nonetheless, no district court or court of appeals has ever considered the effect of the filing of a motion for judgment on the administrative record. That particular motion is unique to the practice of the Court of Federal Claims, as is the rule providing for such a motion. *See* RCFC 52.1, Rules Committee Notes (2006). For this reason, the decisions interpreting and applying Fed.R.Civ.P. 41(a)(1)(A)(i) do not necessarily comport with the practice in this court.

In particular, the prevailing construction of Fed.R.Civ.P. 41(a) does not take into account the relationship between a motion for judgment on the administrative record in this court and the submission of an answer or a motion for summary judgment either in this court or in a district court. A motion for judgment on the administrative record is brought under RCFC 52.1(c). This rule was adopted in 2006 to replace RCFC 56.1, which provided a special variant of summary judgment for cases that could be decided in whole

or in part on the basis of an administrative record. *See* RCFC 52.1, Rules Committee Notes (2006); RCFC 56.1, abrogated effective June 20, 2006. The new rule was adopted because the earlier rule "applied certain standards borrowed from the procedure for summary judgment to review of an agency decision on the basis of an administrative record," but "[t]hat incorporation proved to be confusing in practice because only a portion of the summary judgment standards were borrowed." RCFC 52.1, Rules Committee Notes (2006). "Specifically, the now-repealed RCFC 56.1 did *not* adopt the overall standard that summary judgment might be appropriate where there were no genuine issues of material fact." *Id.* Instead, as noted previously, in acting on a motion for judgment on the administrative record, "the court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'" *Santiago*, 75 Fed.Cl. at 653 (omission in original) (quoting *Acevedo*, 216 Fed. Appx. at 979).

■ As this history demonstrates, RCFC 52.1 is essentially a more refined and expansive version of RCFC 56. 1, which itself was a variant on summary judgment practice. If defendants had brought a motion under former RCFC 56. 1, there could have been little doubt that Mission Essential would have lost its ability to withdraw the case as a matter of right. To suggest that the outcome should be different today, simply because the mechanism for seeking review on the administrative record has been transferred from RCFC 56.1 to RCFC 52. 1, is to elevate form over substance. Moreover, as a matter of custom and practice, the court obviates the need for a defendant to file an answer when a motion

for judgment on the administrative record pertains to all claims in an action, as usually, but not always, happens in a bid protest.[13] Thus, for all purposes, including those of RCFC 41(a)(1)(A)(i), a motion for judgment on the administrative record brought under RCFC 52.1 can, and in a bid protest, typically does, supplant both a motion for summary judgment and an answer. *Cf. Freeman v. United States*, 98 Fed.Cl. 360, 366, 367–69 (2011) (analyzing plaintiff's request to dismiss his case under RCFC 41(a)(2), rather than RCFC 41(a)(1)(A)(i), where the government had already filed a motion for judgment on the administrative record).

In this case, all three parties—Mission Essential, the government, and Harding Security—filed motions for judgment on the administrative record prior to Mission Essential's notice of voluntary dismissal. As a result, Mission Essential cannot withdraw its case pursuant to RCFC 41(a)(1)(A)(i). Nor can it proceed under RCFC 41(a)(1)(A)(ii), because the parties have not signed a stipulation of dismissal.[14] If Mission Essential is to dismiss its case at all, it must do so by requesting an order from the court pursuant to RCFC 41(a)(2). Therefore, the court will treat its notice of voluntary dismissal as a motion to dismiss the case without prejudice under that subdivision of the Rule. *See Freeman*, 98 Fed.Cl. at 367–68.

### B. The Order of Precedence of the Parties' Competing Motions to Dismiss

■ Logically, the next issue becomes whether to give precedence to plaintiff's motion for dismissal under RCFC 41(a)(2) or the government's and Harding's motions to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1).

---

**13.** The Rules Committee Notes on the adoption of RCFC 52.1 recognize that instances arise in which "the administrative record may provide a factual and procedural predicate for [only] a portion of the court's decision." RCFC 52. 1, Rules Committee Notes (2006). Where the basis for the court's decision on some claims in a case is to be developed by proceedings outside an administrative record, as, for example, where a bid protest is combined with claims for breach of contract in a single complaint, an answer would be required. *See, e.g., Montana Fish, Wildlife & Parks Found., Inc. v. United States*, 91 Fed.Cl. 434, 443 (2010).

**14.** In this respect, Mission Essential has advised the court that "[o]n March 9[, 2012,] in order to resolve any procedural issues that may exist in this matter without the need for further judicial intervention, M[ission Essential] alternatively sought consent from each of the parties for dismissal of M[ission Essential]'s complaint with prejudice under RCFC 41(a)(1)(A)(ii). The United States again consented, Harding again refused." Pl.'s Resp. to Harding 3/9 Notice of Additional Cases at 3.

When faced with this question, most courts—including the Federal Circuit—have held that a court must "first determin[e] whether it ha[s] subject matter jurisdiction before granting [a] motion to voluntarily dismiss." *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 479 F.3d 1330, 1342 (Fed.Cir.2007) (applying Fourth Circuit law); *see also, e.g., Harden v. Field Memorial Cmty. Hosp.*, 265 Fed.Appx. 405, 407–08 (5th Cir.2008) ("[T]he court cannot consider the plaintiff's Rule 41(a)(2) arguments unless it has subject matter jurisdiction.") (citing *Shortt v. Richlands Mall Assocs., Inc.*, 922 F.2d 836, 1990 WL 207354, at *4 (4th Cir.1990) (unpublished table decision)); *In re AE Liquidation, Inc.*, 435 B.R. 894, 901 (Bankr.D.Del.2010) ("[A] court should not consider a Rule 41(a)(2) motion when subject matter jurisdiction is in question.").[15]

This order of precedence finds its basis in the fact that a motion under RCFC 41(a)(2) requires the court "to engage in a balancing analysis, to determine whether potential prejudice to the defendant would result from premature termination of the suit." *Watson v. Clark*, 716 F.Supp. 1354, 1356 (D.Nev. 1989), *aff'd*, 909 F.2d 1490 (9th Cir.1990) (unpublished table decision); *see also Standard Space Platforms Corp. v. United States*, 38 Fed.Cl. 461, 466 (1997) (considering "(i) the burden on the defendant if the case were to be dismissed without prejudice, (ii) the progress of the litigation, and (iii) the diligence and good faith of the plaintiff" in rul-

ing on a RCFC 41(a)(2) motion). Thus, "in deciding whether to grant dismissal pursuant to RCFC 41(a)(2), the court exercises its discretion in evaluating the merits of plaintiff['s] arguments in favor of dismissal." *Stockton E. Water Dist. v. United States*, 101 Fed.Cl. 352, 356–57 (2011). However, such an evaluation of the merits is improper if the court has doubts concerning its jurisdiction over the matter. *Id.* at 357 (citing *Walter Kidde*, 479 F.3d at 1342; *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed.Cir. 2010)); *see also In re Fed. Election Campaign Act Litig.*, 474 F.Supp. 1051, 1053 (D.D.C.1979) ("If a court believes that it is without subject matter jurisdiction, it is inappropriate for that court to engage in the balancing process required by Rule 41(a)(2).").

Consequently, the court must first resolve its jurisdictional doubts by addressing the government's and Harding's motions to dismiss. If the court determines that it possesses jurisdiction, then it can weigh both sides' arguments on the propriety of a voluntary dismissal pursuant to RCFC 41(a)(2).

### C. The Defendants' Motions Under 12(b)(1)

██ The government and Harding claim that the court lacks jurisdiction over this case because of 10 U.S.C. § 2304c(e).[16] This statute prohibits protests "in connection with the issuance or proposed issuance of a task or delivery order." 10 U.S.C. § 2304c(e)(1).[17]

---

**15.** A few courts have allowed motions for dismissal under Rule 41(a)(2) when the question of subject matter jurisdiction was particularly vexing. *See Puerto Rico Mar. Shipping Auth. v. Leith*, 668 F.2d 46, 50 n. 9 (1st Cir.1981) (approving of the district court's grant of a voluntary dismissal so that the parties could "avoid the expense of arguing [an] uncertain question of admiralty jurisdiction"). However, even in those instances, courts have recognized that they should not knowingly grant a voluntary dismissal in the absence of jurisdiction. *See Crawford v. F. Hoffman–La Roche Ltd.*, 267 F.3d 760, 767 (8th Cir.2001) ("These issues of diversity jurisdiction were not so clear-cut at the time the district court entered its order of dismissal. For this reason, we do not hold that the district court erred in dismissing the case without a finding of subject-matter jurisdiction. However, because it is clear at this point that federal jurisdiction does not exist, we vacate the order of dismissal for

lack of jurisdiction."). This lenient approach remains somewhat controversial. *See* 8 Moore, *supra*, § 41.40[2] ("[T]he preferable view is that the court must resolve the subject matter jurisdiction issue first.").

**16.** For a discussion of the legislative history of 10 U.S.C. § 2304c(e) and its parent legislation, the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub.L. No. 103–355, 108 Stat. 3243, see *Global Computer Enterprises, Inc. v. United States*, 88 Fed.Cl. 350, 404–06 (2009).

**17.** This law provides for two exceptions to its general ban on task-order-related protests. First, either this court or GAO may hear "a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(e)(1)(A). Second, GAO alone may entertain "a protest of an order valued in

The defendants argue that Mission Essential's protest is inextricably tied up with the Army's award of the original two task orders and its follow-up task order for the eight CLINs under the Army's corrective-action proceedings. *See* Def.'s Mot. to Dismiss at 9–16; Harding's Mot. to Dismiss at 13–22. Mission Essential avers that it is merely protesting the Army's corrective action, not the issuance of the task orders. Pl.'s Mot. for Judgment at 15.

The question before the court, however, is not whether Mission Essential's protest challenges the issuance of a task order, but rather whether its protest is "in connection with" the issuance of a task order. *See* 10 U.S.C. § 2304c(e)(1). That the law must have a broader effect than simply blocking protests of task-order awards is made evident by the statutory use of the phrase "in connection with" such awards. *See DataMill, Inc. v. United States*, 91 Fed.Cl. 740, 756 (2010) ("If Congress intended to bar [only] protests involving the actual 'issuance' or 'proposed issuance' of a delivery order, then it could have drafted the FASA accordingly. It did not. Instead, Congress included in the statute the phrase 'in connection with.' ").

This court has grappled with the scope of 10 U.S.C. § 2304c(e) in rendering several prior decisions. The most explicit discussion of the statute's language is contained in Judge Sweeney's decision in *DataMill*. In that case, the plaintiff sought to circumvent the jurisdictional bar of 10 U.S.C. § 2304c(e) by characterizing its protest as challenging "the [Army's] decision to make a sole source award" rather than contesting the actual delivery order that was issued by the Army under a Navy contract. *DataMill*, 91 Fed. Cl. at 755 n. 22 (emphasis omitted). The court held that the protest was nonetheless "in connection with" the issuance of a noncompetitive procurement via delivery order.

*Id.* at 757. It explained that "the phrase 'in connection with' references something designed to possess a logical or sequential relationship to[,] or be bound up with or directly involved in[,] something else." *Id.* at 756. Applying this definition to the facts before it, the court found that the agency's "underlying decision [to proceed noncompetitively] has a direct and causal relationship to the issuance of the delivery order that the Army utilized." *Id.* at 757 (quotation marks omitted). Consequently, the plaintiff's protest was barred in this court.

Also instructive are the two instances in which judges of this court concluded that a protest was *not* "in connection with" the issuance or proposed issuance of a task order. In *Global Computer Enterprises*, the court held that a protest of modifications to a task order was not barred by 10 U.S.C. § 2304c(e). 88 Fed.Cl. at 410–15. The court reasoned that the modification of an order was simply too remote from the original issuance to be in connection with it. *Id.* at 412.[18] In the second case, *Unisys Corp. v. United States*, 90 Fed.Cl. 510 (2009), the plaintiff challenged an agency's decision to override the mandatory stay of performance of a task order triggered by a GAO protest. *Id.* at 516. The court ruled that 10 U.S.C. § 2304c(e) did not apply, because the protest concerned only the validity of the stay, not the merits of the underlying task order. *Id.* at 517.

Considered against the backdrop of these cases, Mission Essential's protest of the Army's corrective action relates to, and is connected with, the issuance of a task order. First, the corrective action was the direct and immediate cause of the recent issuance of Task Order 12–01. *See* AR 42–434 ("The Army proposes to take corrective action ... by resoliciting the requirement for the [eight

---

excess of $10,000,000." *Id.* § 2304c(e)(1)(B) & (2). Mission Essential does not claim that its protest satisfies the first exception, and it cannot invoke the second exception before this court. Thus the only issue presented by the government's and Harding's motions to dismiss is whether Mission Essential's protest is "in connection with the issuance or proposed issuance" of a task order.

**18.** The court in *Global Computer Enterprises* alternatively concluded that the modification fell outside the scope of the underlying contract and thus was subject to an exception to the jurisdictional bar, permitting a protest on the ground that the order "increases the scope, period, or maximum value of the contract under which the order is issued." 88 Fed.Cl. at 415 (quoting 10 U.S.C. § 2304c(e)(1)(A)).

contested] CLINs."). This connection is even closer than the link in *DataMill*, which was itself tight enough to invoke 10 U.S.C. § 2304c(e). In that case, the plaintiff could at least appeal to a conceptual distinction between "the decision of the [Army] to contract ... without competition" and "the Army's decision to utilize a [task order] to obtain the goods and services." *DataMill*, 91 Fed.Cl. at 755. In the instant case, however, the Army's corrective action *was* its decision to compete a new task order under the IDIQ contract. See AR 42–434 ("All [three] contract holders will be provided the opportunity to submit revised proposals."). To say that there is a "direct and causal relationship," *DataMill*, 91 Fed.Cl. at 756, between the corrective action and the proposed issuance of Task Order 12–01 is an understatement: the two are synonymous.

Second, the Army's corrective action is also intimately entwined with the issuance of the two initial task orders. These events are not linked merely by "but for" causation (*i.e.,* but for the issuance of the task orders there would be no corrective action), which the court found to be insufficient to trigger 10 U.S.C. § 2304c(e) in *Global Computer Enterprises.* See 88 Fed.Cl. at 411. Rather, the corrective action was a direct response to perceived shortcomings in the original issuance of the two task orders. *Cf.* 10 U.S.C. § 2305(f) ("If, in connection with a protest, the head of an agency determines that a[n] ... award does not comply with the requirements of law or regulation, the head of the agency ... may take [corrective] action."). As discussed *supra,* in this instance the corrective action involved setting aside portions of the original task orders and recompeting those parts. Unlike *Global Computer Enterprises* and *Unisys,* which dealt with matters peripheral to the issuance of task orders, here the corrective action goes to the heart of the Army's decision to award the task orders as it did.

Particularly telling is the relief sought by Mission Essential. In *Global Computer Enterprises* and *Unisys,* the plaintiffs did not try to disturb the agencies' task-order awards. In the former case, the protestor sought to enjoin the government from acquir-

ing services under the contested modifications. *Global Computer Enters.,* 88 Fed.Cl. at 354–55, 461. In the latter, the plaintiff asked the court to implement the automatic stay of performance until the original GAO protest was resolved. *Unisys,* 90 Fed.Cl. at 521. By contrast, Mission Essential asks this court to enjoin the Army from taking any action except (1) "awarding the eight [contested CLINs] to [Mission Essential] based on the original proposal submissions," or (2) "recompeting the entire [s]olicitation." Compl. ¶ 60. This relief is nearly identical to that requested by the unsuccessful plaintiff in *DataMill. Cf.* Compl. at 5–6, *DataMill,* 91 Fed.Cl. 740, ECF No. 1 (asking the court to terminate the task order to awardee and to order a recompetition). The fact that Mission Essential's requested relief bears directly on the Army's task orders strongly indicates that this protest is "in connection with the issuance" of those task orders.

Because Mission Essential's protest arises in connection with the issuance or proposed issuance of a task order, it is barred by 10 U.S.C. § 2304c(e). The court thus lacks jurisdiction to consider plaintiff's motion for voluntary dismissal. Contrary to Harding's motion, however, the court must dismiss Mission Essential's complaint *without* prejudice. *See Remmie v. United States,* 98 Fed.Cl. 383, 386 (2011) ("If the court determines that it lacks subject matter jurisdiction, ... dismissal is without prejudice.") (citing *Scott Aviation v. United States,* 953 F.2d 1377, 1378 (Fed.Cir.1992)); *see also Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985) (holding that the trial court erred when it dismissed a claim with prejudice for lack of jurisdiction).

## CONCLUSION

For the reasons stated, the government's and Harding's motions to dismiss under RCFC 12(b)(1) are GRANTED, and the case shall be dismissed without prejudice for lack of subject matter jurisdiction. The pending cross-motions for judgment on the administrative record and Mission Essential's motion to dismiss the case under RCFC 41(a)(2) are

DENIED as moot. The clerk shall enter judgment accordingly. No costs.

It is so ORDERED.